GEORGE V. REYNOLDS, Administrator of Estate of JAMES W. REYNOLDS, v. MARYLAND CASUALTY COMPANY, Appellant.

In Banc, March 29, 1918.

1. **INSANITY**: Presumption: **No Evidence.** The presumption is that every person is sane until the contrary is shown by evidence;  and where there is no evidence, either direct or circumstantial, that

the insured was insane at the time he received the gunshot wound that caused his death, the question of sanity or insanity is not involved.

2. **ACCIDENT INSURANCE**: Suicide: Burden: Presumption. Where the act which caused the death of insured may be accidental or suicidal, the burden is upon the insurer to establish the fact of suicide by a preponderance of the evidence; for the presumption arising from the love of life is, like every other natural law, always within the contemplation of courts.

3. ———: ———: Presumption: Circumstantial Evidence: Proof of Accident. If the known facts are consistent with the theory of natural or accidental death, the presumption which the law raises from the ordinary motives and principles of human conduct requires a finding against suicide; and (second) when circumstantial evidence is relied on, the accident company must establish facts which exclude any reasonable hypothesis of natural or accidental death. This does not relieve the plaintiff of the burden of proving accidental death by a preponderance of the evidence as a condition of recovery; but it does require that, when he has put in evidence circumstances which prove that the death was either accidental or suicidal, the unreasonableness of the theory of suicide must be duly considered in weighing it against the more reasonable and natural theory of accident.

*Held*, by FARIS, J., dissenting, with whom BOND and WOODSON, JJ., concur, that the presumption against suicide in a case of unexplained death by violence is not of itself alone of such evidenciary substance as to be sufficient to take the case to the jury. A presumption against suicide cannot exist in the presence of evidence diametrically contradicting it; but the moment explanatory evidence, whether direct or circumstantial, comes into the case, the presumption dissolves and becomes wholly non-existent.

*Held*, also, that if in addition to the presumption against suicide it is necessary to indulge in four other presumptions in order to reach the conclusion that the unexplained violent death of the insured was accidental, and not suicide, as is done in this case, thereby piling presumption upon presumption, the case should not be submitted to the jury.

4. ———: ———: Hotel Registration Under Assumed Name. The fact that deceased registered under an assumed name at the hotel at which his dead body was on the next day found in a room to which he had been assigned, is not a circumstance indicative of an intention to kill himself, in view of the fact that he was well known at the hotel and required uninterrupted study in preparation for the business he was about to transact.

*Held*, by FARIS, J., dissenting, with whom BOND and WOODSON, JJ., concur, that the evidence demonstrates that deceased did not go to the room for any such purpose.

Reynolds v. Casualty Co.

5. ———: ———: **Pistol Wound in Back of Head.** Deceased, found dead in the bathroom of a bedroom of a hotel, had sustained two wounds from a pistol. One was in the cheek, which, together with his collar, was powder-burned; this was superficial and was not sufficient to cause death or insensibility. The other was caused by a bullet which passed through his head near the medial line from the base of the skull to his forehead between his eyes, but neither at its entry nor exit was there any evidence of heat or unburned explosive. *Held*, that even if it be conceded that the bullet did not enter at the back of the head, which would be contrary to the evidence, and that he held the pistol in his own hand and discharged it against his forehead, it does not seem possible that the same effects of fire and powder would not have been visible there as were visible upon his cheek and collar; *and* that it seems impossible that the deceased could have voluntarily inflicted this fatal wound. [FARIS, BOND, and WOODSON, JJ., dissenting.]

6. ———: ———: **Speculation as to Cause of Death.** If the wound which caused the insured's death was not inflicted voluntarily, the defense of suicide necessarily fails, and it is unnecessary to speculate as to how it was done.

7. ———: ———: **Instruction: Roving Commission.** An instruction for plaintiff which told the jury that if they believe from the evidence that the death of the insured resulted from a gunshot wound accidentally inflicted, independently and exclusively of all other causes, which was according to the pleadings and the theory of the trial, did not give the jury a roving commission to find that his death was accidental, without requiring them to find any facts which constituted accident.

8. ———: ———: ———: **Resort to Conjecture: Caution.** Where the jury were plainly told that "the burden of proof is upon the plaintiff to establish by a preponderance or greater weight of the evidence that the death of the insured was effected by accidental means," it was not error to refuse an instruction asked by defendant which told the jury that in arriving at their verdict they could "not resort to guess, conjecture or speculation," for this instruction is itself framed in language calculated to mislead, where the case rests entirely upon circumstantial evidence. If further caution is desired it should be framed in different language.

9. ———: ———: **Evidence: Opinion: Waiver.** It was not error to admit the testimony of the undertaker that the death of insured was not caused by the wound in the cheek but by the one from the base of the skull to the middle of the forehead, first, because the defendant by a deposition taken and filed by it and read by plaintiff had established the same facts by the deputy coroner and thereby invited the error, if any, and, second, because the matters objected to were specific facts and not mere opinion.

10. ———: ———: ———: **Discharge of Pistol.** Where the discharge of the Colt automatic pistol is admitted, it is not error to admit testimony that a violent fall might discharge it. Such evidence is not to be excluded on the ground that there was no evidence of such fall, where there is no evidence that the pistol was held in the hand of the insured.

11. ———: ———: **Religious Character of Deceased.** Where the defense to a suit on an accident insurance policy is that the insured committed suicide, it is not error to permit his mother to testify that he was a believer in God, a member of the Episcopal Church and active in Sunday school work.

Appeal from Audrain Circuit Court.—*Hon. James D. Barnett,* Judge.

AFFIRMED.

*Holland, Rutledge & Lashly* for appellant.

(1) The court erred in refusing the demurrer to the evidence asked by defendant at the close of all the testimony, because there was no evidence upon which to base a verdict that the death was accidental. The law is well settled that inferences may not be based upon inferences, or presumptions upon presumptions. And the verdict in this case could not have been based upon anything but a series of presumptions. 16 Cyc. 1051; United States v. Ross, 92 U. S. 281; Bigelow v. Met. St. Ry., 48 Mo. App. 372; Moberly v. Railway, 98 Mo. 183; Rapp v. Railway, 106 Mo. 428; Schepeis v. Railroad, 126 Mo. 665; Myers v. Kansas City, 108 Mo. 487. Even if there were a scintilla of evidence upon which to base the verdict, which we deny, this would not be sufficient, as a demurrer to the evidence should be given unless there is substantial testimony upon which a verdict may be based. Williams v. Railway, 257 Mo. 87. (2) The verdict is against the evidence and the weight of the evidence, and so clearly so that it is obviously based merely upon sympathy and prejudice. (3) The court erred in giving Instruction 1 at the instance of plaintiff, in that said instruction gives the jury a roving commission to find that the death was

accidental, without requiring a finding of any facts which it is claimed constituted accident; and also in that it ignores a substantial defense, to-wit, that of suicide, sane or insane. The instruction to be proper in form should have required a finding of facts which would constitute an accident within the meaning of the policy, and should have told the jury that if the death was caused by self-inflicted wounds while *non compos,* plaintiff would not be entitled to recover even though said death were accidental. Allen v. Transit Co., 183 Mo. 411, 435; Mulderig v. Railroad, 116 Mo. App. 655; Sommers v. Transit Co., 108 Mo. App. 319; Miller v. United Railways, 155 Mo. App. 528; Delo v. Mining Co., 160 Mo. App. 38; Nagel v. Railroad Co., 169 Mo. App. 284. (4) The court erred in refusing to give instruction asked by defendant to the effect that in arriving at a verdict the jury could not resort to mere guess, conjecture or stipulation. This instruction directly stated the law, and should have been given.

*Watts, Gentry & Lee* and *Fauntleroy, Cullen & Hay* for respondent.

(1) The court should not have sustained the demurrer to the evidence. It is earnestly insisted that there is no evidence whatever to sustain the theory of accident, but that all the evidence shows conclusively —so conclusively that two reasonable minds could not differ on the proposition—that James W. Reynolds committed suicide. No one saw the shot fired. The evidence is purely circumstantial. "When circumstantial evidence only is relied on, the defense fails unless the circumstances exclude with reasonable certainty any hypothesis of death by accident or by the act of another." Bacon on Benefit Societies, sec. 336a. This rule is recognized in all the well-considered cases on the subject, in both State and Federal courts, and by all textwriters treating it, throughout this country, as is also the rule that the presumption of law is against suicide. Laessig v. Protective Assn., 169 Mo. 272; Insurance Co.

v. McConkey, 127 U. S. 661; Wilkinson v. Ins. Co., 240 Ill. 205; Ins. Co. v. Crayton, 209 Ill. 550; Shotliff v. Modern Woodmen, 100 Mo. App. 138; Wigmore on Evidence, secs. 2510, 2540; Accident Co. v. Thornton, 100 Fed. 582; Washburn v. Benefit Assn., 10 N. Y. Supp. 365; Almond v. Modern Woodmen, 133 Mo. App. 382; Claver v. Woodmen of the World, 152 Mo. App. 154; Hunt v. Pyramids, 105 Mo. App. 41; Ins. Co. v. Hurt, 79 S. E. 401; Pagel v. Casualty Co., 148 N. W. 878; Heustis v. Ins. Co., 155 N. W. 643; Korig v. Indemnity Co., 102 Minn. 31; Waldon v. Life Assn., 131 N. W. 962; Assurance Co. v. Hebert, 37 Iowa, 373; Cox v. Royal Tribe, 42 Ore. 365; Modern Woodmen v. Kincheloe, 91 N. E. 976; Ins. Co. v. Nitterhouse, 11 Ind. App. 155; Stephenson v. Life Assn., 108 Ia. 637; Ins. Co. v. Spaulding, 150 Pac. 494; Ross-Lewin v. Ins. Co., 78 Pac. 305; Benefit Assn. v. Sargent, 142 U. S. 691; Leman v. Ins. Co., 24 L. R. A. 589; Ins. Co. v. Millward, 68 L. R. A. 285; Boynton v. Assurance Co., 105 La. 202; Ins. Co. v. Kaiser, 74 S. W. 203; Ins. Co. v. Maddox, 127 S. W. 503; Ins. Co. v. Ford, 130 S. W. 769; Fidelity & Cas. Co. v. Egbert, 84 Fed. 410; Cochran v. Ins. Co. of N. Y., 79 Fed. 46; Krogh v. Modern Brotherhood, 141 N. W. 276. Is the inference of suicide the only inference that can be reasonably drawn from all the facts and circumstances shown in the evidence in the case at bar? It is well settled that, in passing upon a demurrer to the evidence, the court will consider only the evidence most favorable to plaintiff's side of the case, and if, thus considering the case, it is found that there is substantial evidence to uphold a verdict for the plaintiff, the appellate court will not reverse a judgment on the ground that a demurrer to the evidence should have been sustained. (2) If there was substantial evidence entitling the plaintiff to go to the jury, of course, the weight of the evidence was for the jury and the trial judge. Nephler v. Woodward, 200 Mo. 179. (3) Instruction I given at the instance of the plaintiff was correct in every respect. The only complaint as to that

instruction is the suggestion by appellant that James W. Reynolds may have been *non compos,* and, while in that condition, may have intentionally fired the shot that killed him. To hold that the plaintiff's instruction should have submitted to the jury the question as to whether or not he was insane would be to hold that a question as to which there was no evidence, should be submitted in the instruction. There is no presumption of law that any man is insane in the absence of evidence tending to establish his insanity, but, on the contrary, all men are presumed to be sane until the contrary is shown. Chadwell v. Reed, 198 Mo. 379; Banking Co. v. Loomis, 140 Mo. App. 70. (4) There was no error in refusing the instruction asked. The most that can be said of the right of the court to give such instruction is that in its discretion the court can do so. The trial court having exercised its discretion against the giving of it, that discretion will not be interfered with on appeal. Stauffer v. Railroad, 243 Mo. 335.

BROWN, C.—This is an action by the administrator of James W. Reynolds, deceased, upon an accident insurance policy issued by defendant and payable to the estate of the intestate.

The substance of the pleading is as follows:

The petition alleged in substance that plaintiff had been duly appointed the administrator of the estate of James W. Reynolds, deceased; that the defendant was a corporation organized under the laws of the State of Maryland and engaged in the business of insurance; that on the 27th day of November, 1909, the defendant issued and delivered to James W. Reynolds of Chicago, Illinois, a policy of accident insurance by the terms of which it agreed to pay the estate of said James W. Reynolds the sum of ten thousand dollars in case of death by bodily injuries effected directly, independently and exclusively of all other causes, through external, violent and accidental means; that said policy provided for the payment of an additional sum in case of renewal;

that on account of two annual renewals an additional sum of one thousand dollars was payable, so that the total amount due on account of the alleged death of James W. Reynolds was eleven thousand dollars; that said James W. Reynolds paid all the premiums called for by said policy and performed all the duties incumbent upon him under said policy; that the death of said James W. Reynolds occurred on the 19th day of September, 1911, and resulted solely from bodily injuries effected directly, independently and exclusively of all other causes through external, violent and accidental means, to-wit: from a gunshot wound inflicted upon him on the day of his death; that defendant was duly notified of said death and furnished plaintiff blanks upon which to make formal proofs of said death, and plaintiff did furnish said proofs as required by said policy.

The answer of defendant contained a general denial and a plea that the policy sued upon, together with the renewal thereof, did expressly provide that suicide, sane or insane, was not covered thereby, and that the death of James W. Reynolds was suicidal within the meaning of said policy; that at the time said policy was issued and delivered to said James W. Reynolds, the latter was a citizen and resident of Chicago, Illinois, and that said policy and renewal was issued to and delivered to James W. Reynolds in said city of Chicago from the office of defendant in said city and by an agent of defendant in said city, as a part of defendant's business in said city; and that at the time said policy was so issued to said James W. Reynolds the latter represented that he was residing in said city of Chicago, and by the said policy and the said renewals said James W. Reynolds did warrant that such statement was true.

The reply of plaintiff was a general denial.

There was judgment for plaintiff for $11,780, the full amount claimed, from which this appeal is taken.

The evidence shows that James W. Reynolds was thirty-two years old when he died and had never been

married.  His father, Hon. George D. Reynolds, with his mother, sister and brother resided together in St. Louis, Missouri; the deceased frequently visited them. He was a young man with college training, good health, of good character in all respects, and fond of athletic sports, of music and of his family.  He was "a mild crank" with firearms, a member of a pistol club, and one of his exercises in that respect was to throw his pistol in the air so that it would turn over twice, and catch and discharge it as it came down.  He entered the service of the Harbison Walker Refractories Company of Pittsburg as salesman in December, 1906, and was with them until his death.  He had been rapidly advanced.  He first worked from Pittsburg, then went to Chicago, where he had charge of a large district, and a short time before his death was returned to Pittsburg with a salary of $500 per month.  His duties required him to spend a portion of his time in Chicago. He had accumulated considerable property, and was not in debt.  His disposition was pleasant.  On Monday, September 18, 1911, he was at the office of Harbison Walker Company, where he discussed the business of the company and told the manager that on the following day he expected to go to Aliquippa, a small town about fifteen miles from the city, to visit Jones & Laughlin, a plant located at that place, for the purpose of getting a contract from it.

The deceased was acquainted at the Fort Pitt Hotel in Pittsburg.  They kept what they called a city account with him; that is to say, he frequently came in for lunch and sometimes had a room, all of which was charged to him and the accounts were rendered in due course. The deposition of Mr. Stewart, a clerk at the hotel, was taken twice by the defendant.  The first time he testified that the register containing the entries for September 19, 1911, had been destroyed.  In the last deposition, taken after the first trial (there were two trials), he stated that it had been found, and produced a page purporting to contain such entries, and testified

in connection with it that the deceased, with whom he was acquainted, but whom he did not recognize by name at the time, came to the hotel at about half past seven o'clock on the morning of that day and asked him for a well lighted room on one of the upper floors. No such room was vacant, and he was assigned to room number 129 on the first floor above the lobby, with the understanding that he would be transferred as soon as such a room as he desired should be vacated. He registered the name J. C. Howard and went to his room, having with him a black grip. This witness saw no more of him. The next day before noon the housekeeper reported that she could not get in Room 129 and thought there was somebody in it. The room was opened and the bathroom door was found to be locked. The pins were removed from the hinges by the house engineer. On entering it, the dead body of Mr. Reynolds was found on the floor, half reclining against the wall at the south end next the bedroom, and between the bathroom door and the bathtub. The bathroom was small. Directly opposite the door leading to the bedroom and against the north wall, was the washstand. Above it was a glass shelf about five inches wide and two feet long, on which sat the mirror. On the right of the washstand and against the north wall, was the radiator, to its left was a commode, and to the left of the commode along the west wall, extended the bathtub. There was much blood on the floor and on the bathtub. A Colt automatic pistol of the model of 1907 lay in the washbowl, the magazine of which contained five loaded shells, while two had been exploded. A bullet was imbedded in the bathroom door about five and a half feet from the floor. There was a bullet mark on the wooden ceiling above the bathtub, which a witness described as a mere spat, and a bullet lay in the bathtub. The wounds upon the body were a bullet hole in the back of the head near the base of the skull; another in the lower part of the forehead between the eyes; another in the flesh of the cheek near the articulation of the lower jaw, which passed through

the flesh, and a bullet hole through the collar. On the wound of the cheek were powder mark and burn, a considerable burn, and there were powder marks on the collar. There were no burns or powder marks whatever either on the wound in the front or back of the head. On the table in the bedroom was an open satchel having nothing in it except papers and pamphlets such as were used in describing the products of the Harbison Walker Company and intended to be used in obtaining orders. The hole in the back of his head was small and clean cut, while that in the forehead was large, and about it the bone was splintered and shattered and the skin torn.

The defendant took in Pittsburg and filed in the cause the deposition of Mr. John P. Black, Deputy Coroner of Allegheny County, Pennsylvania, who viewed the body for the purpose of ascertaining the cause of the death. In answer to the request of defendant's counsel to describe the wounds he said, without objection, with reference to the one in the head: "It entered, as I thought, from the rear, about the base of the skull, and came out almost directly between the eyes and forehead. Q. Are you able to state, Mr. Black, by what means those wounds were caused? A. By a revolver. Q. Were they bullet wounds? A. Yes, sir. Q. How do you know that? A. I could not say positively, but think from the appearance they were. . . . Q. And regarding the wound in the back of the head and in the front of the forehead, was that, in your opinion, caused by one or more than one bullet wound? A. One." This witness was also particularly examined by defendant's counsel about powder marks as follows: "Q. What was the general appearance of the wound *on the cheek and about the collar?* A. There were powder marks, if that is what you mean. Q. If there were powder marks about the wound, what was the appearance of those marks with regard to their color and size? A. They were black and there was a burn. Q. What about the size of the mark? A. You mean the bullet hole or the powder marks? Q. I mean the powder marks that you

have spoken of.  A.  If I recall rightly, they were quite extensive, largest around the hole—I suppose a half an inch or more, scattered.  Also powder marks on the collar.''

Evidence to which specific objection was made by defendant will be noted in the opinion.

The defendant asked an instruction in the nature of a demurrer to the evidence, which was refused, and thereupon the court gave for plaintiff a single instruction, which, omitting formal matters not in issue here and upon which no question is made, directed them to find for the plaintiff if they should find from the evidence ''that the death of said James W. Reynolds directly resulted from bodily injuries, effected directly, independently and exclusively of all other causes, through external, violent and accidental means, to-wit, from a gunshot wound accidently inflicted in and upon the head of the said James W. Reynolds on said 19th day of September, 1911.''

For the defendant the court gave the following instructions:

''1.  The court instructs the jury that by the policy sued upon herein the defendant did not agree to pay anything to the plaintiff in case of the death of James W. Reynolds unless said death should be caused by accidental means.

''The court therefore instructs the jury that if you believe and find from the evidence that the death of James W. Reynolds was caused by a gunshot wound inflicted upon himself by said James W. Reynolds deliberately then and in that case the court instructs the jury that the said death of James W. Reynolds was not accidental and your verdict must be for the defendant.

''2.  The court instructs the jury that the policy of insurance sued on herein provides that no recovery can be had for the death of the insured unless such death be caused by accidental means.  Therefore the court instructs the jury that the plaintiff cannot, under any

circumstances, recover in this case unless you believe and find from the evidence that the death of James W. Reynolds was caused by accidental means. And the court further instructs the jury that the burden of proof is upon the plaintiff to establish by a preponderance or greater weight of the evidence that the death of James W. Reynolds was due to accidental means.

"3. The court instructs the jury that the policy sued on herein is a policy of accident insurance and that the indemnity mentioned therein in case of death is only payable in case the death of the assured is caused by accidental means. And the court instructs the jury that plaintiff is not entitled to recover anything on account of the death of James W. Reynolds unless you believe and find from the evidence that the said death was effected by accidental means.

"And the court instructs the jury the burden of proof is upon the plaintiff to establish by a preponderance or greater weight of the evidence that the said death of James W. Reynolds was effected by accidental means.

"4. The court instructs the jury that the policy sued on herein is a policy of accident insurance and that the indemnity therein in case of death is only payable in case the death of the assured is caused by accidental means. And the court instructs the jury that plaintiff is not entitled to recover anything on account of the death of James W. Reynolds unless you believe and find from the evidence that the said death was effected by accidental means.

"And the court instructs the jury that if you believe and find from the evidence that on or about the 19th of September, 1911, James W. Reynolds intentionally shot himself twice with the intention of producing his death, then and in that case his death was not accidental.

"5. The court instructs the jury that the plaintiff cannot recover in this case unless you find that he has proven by a preponderance of the testimony that the

death of James W. Reynolds was accidental. And in this connection the court instructs the jury that if you find the testimony is evenly balanced or does not preponderate in favor of plaintiff as to said issue, then your verdict must be for defendant.''

And refused the following: ''The court instructs the jury that in arriving at a verdict in this case, you cannot resort to guess, conjecture or speculation, but must be controlled by the greater weight of the evidence as to the matter and all the circumstances of the death of the deceased, James W. Reynolds.''

I. The sole question going to the merits of this case is whether the plaintiff's intestate died from the effect of a gunshot wound inflicted accidentally or whether the same wound was inflicted by himself voluntarily for the purpose of producing the injury. The question of sanity or insanity is not involved, because the presumption is that every person is sane until the contrary is shown by evidence; and here there is no evidence, either direct or circumstantial, that he was insane. The judgment appealed from hangs upon the simple question whether the insured came to his death by accident or suicide. If he inflicted the fatal wound purposely, it was suicide.

No legal proposition is more firmly established than that where the act which caused the death may be either accidental or suicidal the burden is upon the insurer to establish the fact of suicide by a preponderance of the evidence, for the presumption arising from the love of life, which is created for its preservation, is, like every natural law, always within the contemplation of the courts. It follows, as is stated by Mr. Bacon in his work on Life and Accident Insurance (4 Ed.), sec. 438, that: ''When circumstantial evidence, only, is relied on, the defense fails unless the circumstances exclude with reasonable certainty any hypothesis of death by accident, or by the act of another.'' [Boynton v. Assurance Society, 105 La. 202; Shotliff v. Modern Woodmen, 100 Mo. App. 138; Norman v. United Com-

mercial Travelers, 163 Mo. App. 175; Almond v. Modern Woodmen, 133 Mo. App. 382; Claver v. Woodmen of the World, 152 Mo. App. 155; Hunt v. Ancient Order of Pyramids, 105 Mo. App. 41; Home Benefit Assn. v. Sargent, 142 U. S. 691; South Atlantic Life Ins. Co. v. Hurt's Admx., 79 S. E. (Va.) 401; Life Ins. Co. v. Koegel, 104 Va. 619; Pagel v. Casualty Co., 158 Wis. 278; Huestis v. Ins. Co., 155 N. W. (Minn.) 643; Kornig v. Indemnity Co., 102 Minn. 31; Jenkin v. Life Ins. Co., 131 Cal. 121; Insurance Co. v. Nitterhouse, 11 Ind. App. 155; Insurance Co. v. Milward, 68 L. R. A. 285.]

These cases, and many others to which our attention has been directed, amply sustain the doctrine stated in the proposition we have quoted from Mr. Bacon's excellent book. In the Kornig case, supra, the court states it more fully as follows: "Where the defense of suicide is asserted against an action by a beneficiary on an insurance policy (a) the burden of proving that the deceased committed suicide is upon the defendant; (b) the presumption is against suicide; (c) if the known facts are consistent with the theory of natural or accidental death, the presumption which the law raises from the ordinary motives and principles of human conduct requires a finding against suicide; (d) when circumstantial evidence is relied on, the defendant must establish facts which exclude any reasonable hypothesis of natural or accidental death."

It is a doctrine that appeals to every just and reasonable mind. It does not relieve the plaintiff from the burden of proving accidental death by a preponderance of evidence as a condition of recovery, but requires that when he has put in evidence circumstances which prove that the death was either accidental or suicidal, the unreasonableness of the theory of suicide must receive due consideration in weighing it against the more reasonable and natural theory of accident.

In this case the evidence is purely circumstantial. As a foundation for the consideration of the physical facts attending the death of the insured it has been

shown beyond any attempt at controversy that he was
only thirty-two years old; that the position to which he
was entitled by birth and family was exceptionally good;
that his education was liberal; that during the six years
covered by his business activities he had been so suc-
cessful that at the time of his death he was earning
$500 per month; that his relations with his family were
affectionate; that his habits were unquestioned and
that he was fond of music and sports. In the latter
respect he was described by Judge Holtcamp as being
"a mild crank with firearms." His personality, cir-
cumstances and disposition all suggest satisfaction with
life and ambition to test his future.

In reasoning from this foundation it is impossible
and would probably be improper to exclude from our
minds all the results of our own experience and obser-
vation, upon which our intelligence is largely developed.
It was from this class of knowledge that BREAUX, J.,
said in the Boynton case, supra: "The freaks of a
gun when not carefully handled are sometimes wonder-
ful." The first circumstances connected with the death
of Mr. Reynolds was his appearance at the Fort Pitt
Hotel early on the morning of September 19, 1911. This
was a day on which he said at the office of his employer
that he expected to go to Aliquippa to make a sale.
At the hotel, where he was acquainted to the extent, at
least, of having a running account in which accommoda-
tions furnished him were charged, he asked for a well
lighted room on an upper floor. No such room was va-
cant, and he was given a room on the first floor, which
had been converted from a parlor, with the promise
that he would be changed to one more suitable as soon
as it should be vacant. His manner was cheerful and
his request does not appear to have struck the clerk as
unusual or unnatural. He registered as J. C. Howard,
and was sent to the room, and was never afterward seen
alive. That he registered under an assumed name is
suggested as a circumstance indicative of an intention
to kill himself. We fail to see any connection between

these two acts.  He certainly could not have done so for the purpose of concealing his identity in the hotel, where he was well known.  A more natural and quite innocent explanation is suggested by the fact that he had nothing with him but the printed literature which it was natural he should desire to study in preparation for his trip to Jones & Laughlin at Aliquippa, for which he needed light, and the conjecture that he did not desire to be disturbed by anyone, and particularly by those with whom he had the business appointment, until he was prepared to go to them as he had arranged.  The composition and structure of refractories is of great interest to those who build and line furnaces, and involves scientific questions of much importance.  That he should require light for this kind of work is much more readily apparent than that he should require it to shoot himself with his own pistol.  He could not have desired to conceal his identity after death, for he was well known in the house and his bag contained ample means of identification in the literature of his employers, who, with Mr. Thompson, his lawyer, were in fact notified immediately after the discovery of the body.  If suicide is to be proved we must go to the body itself and the place where it was found for the evidence.

There were two wounds, one in the cheek, evidently made from the front; this was superficial and there was absolutely no evidence that it was sufficient to cause death, or even insensibility, but its effect, with the explosion at his ear, must have been stunning.  That the weapon which inflicted it was close was evident from the burn on the skin and the marks of unconsumed powder at the wound and on the collar.  That it indicates an attempt to kill himself is absurd.  That, if the wounds were voluntarily inflicted, it was the first, is evident from the fact that the other and necessarily fatal wound passed through his head near the medial line from the base of his skull to his forehead between his eyes.  It does not need the testimony of experts to show that this was fatal, and that with its inflict-

ion his volition and ability to shoot ceased. The first wound is shown by its powder burns to have been made with the weapon close to the face. Neither at the entry or exit of the other was any evidence of heat or unburned explosive. It was, therefore, made while the weapon was at a considerable distance. The evidence, we think, indicates conclusively. that it entered the back of his head. If this be true, is it possible that he could have held the weapon in his hand at the time it was discharged and far enough away to avoid burning or marks of powder? Should the direction of this wound as all the evidence states it be a mistake, and had he held the pistol in his own hand and discharged it against his forehead, it does not seem possible that the same effects of fire and powder would not have been visible there as they were visible upon his cheek and collar.

A question similar to this was in the Pagel case, supra: When the body was found an automatic pistol was lying five or six inches from the right hand. There was a bullet hole in the left temple. The court said: "Now, if he desired to take his own life, the idea suggests itself to me that it would have been more probable and more in keeping with the intent to suicide, while he had his revolver in his right hand, to place it at his right temple in case he formed the intent to have the bullet enter his head near the temple, than it would be to throw his right arm forward, up and around so as to reach his left temple, as it would be the most natural to use the means to accomplish the act with the least resistance; and while it may be argued that it is unusual for a person who is familiar with the use of firearms to suffer an accident of this kind, yet perhaps his familiarity and acquaintance with the use of the gun induced his negligence." While in that case the court drew a natural inference from the physical facts, it was yet possible that he might be wrong. In this case it seems impossible that the deceased *could* have voluntarily inflicted the wound which caused his death.

If it were not inflicted voluntarily, but by accident and without intention, the defense of suicide necessarily fails, and it is unnecessary to indulge in speculation as to how it was done. That firearms are treacherous and dangerous and that playing with them is liable to result unexpectedly is proverbial. That Mr. Reynolds habitually made a play thing of his gun is well established in this evidence. His pride in his skill in handling it is evident. One of his practices in this respect was to throw it into the air with such a movement that it would turn over twice, and to catch and discharge it as it came down. Of course such skill could not be acquired otherwise than by frequent practice, and the proper toss could not be attained without the destruction of expensive ammunition. On going into his room it is one of the most natural things in the world that he should desire to retire to the bathroom. He took off his coat, hung it over the back of a chair and entered that resort, bolting the door behind him as is the instinctive habit of most people. In arranging his clothing for such an occasion it was necessary if he carried his gun in his pocket, to remove it, so that it would not fall upon the floor. I think most people who have carried a gun will readily recognize this movement. While he held it in his hand it was perfectly natural that his seclusion from timid spectators suggested that it would be a good time and place to practice a favorite exercise and that he should toss it in the air and catch it as it came down. The evidence shows that it was very easy on the trigger, and the slighest mistake, so that his thumb or finger would come in contact with it in its fall, would necessarily discharge it in the direction in which it happened to be pointed. This inference, fully justified by the evidence, would account for the wound in the cheek, which cannot be explained on any theory of voluntary action. Upon the occurrence of the shock caused by the explosion and wound every inference of deliberate or voluntary action ceases, and instinct must take its place. If he threw it from him and it came

down heavily and squarely upon its butt, the momentum of the movable trigger in its effort to continue its fall, would by a simple law of gravity discharge it, for it was fully cocked by its first explosion. The corner of a shelf or any other obstruction which might touch the trigger in its flight might have the same effect. It is needless to speculate, there are so many ways in which a loaded and cocked pistol might be discharged while pursuing its own erratic course. The inferences which we have suggested have the merit of being a possible solution, while the theory of suicide seems impossible. The court properly refused the demurrer to the evidence.

II.    The defendant assails the instruction given by the court for plaintiff because it "gives the jury a roving commission to find that the death of James W. Reynolds was accidental, without requiring a finding of any facts which it is claimed constituted accident; and also in that it ignores a substantial defense, to-wit, that of suicide, sane or insane." This instruction told the jury directly and without circumlocution that if they believed from the evidence that the death of Reynolds resulted from a gunshot wound accidentally inflicted in and on his head independently and exclusively of all other causes they should find for the plaintiff. This was the theory on which the pleadings were framed and the case tried. That the insured died from the gunshot wound in his head was the admitted fact which constituted the common foundation of the pleadings on both sides. There was no suggestion of insanity in the case, or issue of suicide while insane. It was, as we have said, submitted on the theory of accident or suicide by both parties, and whatever might have been the verdict neither had the right to complain of his own error.

*Instruction.*

III.    The defendant complains of the refusal of its instruction by which it asked that the jury be told that in arriving at their verdict they "could not resort to guess, conjecture or speculation." This instruction seems to have been founded

*Conjecture.*

largely upon regard for the sound of the words used rather than their sense, and is objectionable upon that ground. The case rested entirely upon circumstantial evidence; that is to say, the ultimate facts must be found by the jury by putting or joining together all the relative circumstances before them. Such bringing, together, as well as the result obtained, constitute the primary definition of the word conjecture, as is plainly indicated by its etymology, while one of the definitions of the word speculation, which we find in the International Dictionary, is "the faculty, act, process, or product of intellectual examination or research, especially reasoning taking the form of prolonged and systematic analysis." The jury should not be discouraged in these respects.

The jury were plainly told that "the burden of proof is upon the plaintiff to establish by a preponderance or greater weight of evidence that the said death of James W. Reynolds was effected by accidental means." This would seem to be a sufficient caution as to the source to which they must look for facts in arriving at a verdict. If further direction or caution was desired it should have been framed in language not calculated to mislead them.

IV.    The defendant took the deposition of Mr. Black, the Deputy Coroner of Allegheny County, Pennsylvania, in which, in answer to its questions, **Evidence.** he stated in detail the position and apparent direction of the wound upon the body, and that the flesh wound upon the cheek was not sufficient to produce death, while the wound in the head was. It filed this deposition in the case, but did not read it. It was read by plaintiff without objection to any of the details so proved. That the wound in the head as so described was sufficient to cause death is not only evident to the court uninstructed by expert opinion, but the fact that it did was really the foundation of the case made by both parties. Objection was made by defendant to proof of all these same facts, in substantially

the same form, by Mr. Samson, the undertaker. We do not think this constituted reversable error for the following reasons: (1) It was invited by defendant, in taking, and permitting, without objection, the reading of its deposition of Mr. Black covering these details, and (2) the matters ·objected to were specific facts and not matters · of mere opinion.

V.   The defendant objected to proof that a violent fall might discharge the pistol, on the specific ground that there was no evidence of such fall. Neither was there any evidence that the pistol was held in the hand of the insured and discharged by pulling the trigger, which is a necessary element in the proof of suicide. It is, however, a matter of common knowledge that a pistol like the one here described could be so discharged, but it is not, perhaps, a matter of common knowledge that a similar weapon could be discharged by a violent fall, and must. be proved as a part of the issue in determining in which of these two ways it was discharged.. The discharge is admitted, and it is for the jury to determine how it might occur and evidence· tending to assist them in that inquiry was admissible.

*Dicharged Pistol.*

VI.   The mother of the insured was permitted to testify that he was a believer in God, a member of the Episcopal Church and active in its Sunday school work. We do not think that there was error in this. [State v. Elliott, 45 Iowa, 486; Hill v. State, 64 Miss. 431; Goodall v. State, 1 Ore. 333; People v. Chin Mook Sow, 31 Cal. 597.] We think the same rule should apply as in case of dying declarations. Where they are admitted on the principle that the person who makes them knows that he stands upon the brink of mortal dissolution and believes that he is about· to enter a phase of existence in which he will enjoy the rewards flowing from his good deeds and suffer the punishment incurred by his evil ones, would

*Religious Character of Deceased.*

necessarily be impressed with the determination that the last act of his mortal existence should not add to the record of his sins. The principle must apply with equal force to one who is tempted to make the very act of his dissolution a crime. If it is proper in such cases to prove the disbelief in a dispenser of future rewards and punishments, it follows that such belief is an issue competent to be proved.

We see no reversable error in the record, and the judgment of the circuit court is affirmed. *Railey, C.,* concurs.

PER CURIAM.—The foregoing opinion of BROWN, C., is adopted as the opinion of the Court in Banc. *Graves, C. J.,* and *Walker; Blair* and *Williams, JJ.,* concur; *Bond, Faris* and *Woodson, JJ.,* dissent.

FARIS, J. (dissenting)—I take the occasion afforded by the overruling of the motion for a rehearing to dissent thereto, and to the judgment entered in the case, and briefly to set down the reasons which impel me to regard as erroneous the judgment entered herein. I shall not take up space either to set forth anew the facts in detail, or to quarrel with the facts found by our learned Commissioner, as he has set them out in his opinion. For I conclude after a painstaking reading of the record that he has been at least as accurate in finding the facts as is necessary for the views which I entertain of the law which I think ought to apply to the facts as he has found them.

Stripped of evidence as to the antecedent characteristics of habit, custom and temperament of the assured, the facts are that assured about 7:30 o'clock in the morning of September 19, 1911, went to the Fort Pitt Hotel, in Pittsburg, Pennsylvania, where he was not personally well enough known to the management to be recognized as *and was not on the occasion recognized as* James W. Reynolds, and registered there under the assumed name of J. C. Howard. When registering he

asked for *a well-lighted room* with a bath, *high up in the building*. No such room being then available he was given temporarily a room with a bath on the second floor. He went to this room and on entering it, bolted the door thereof on the inside, and left the key outside, hanging in the lock. Thereafter he was not heard, nor heard from, nor seen till he was found about 10:30 o'clock in the forenoon of the next day, dead from pistol-shot wounds. The surroundings and the situation, and the condition of things negatived any possible inference of murder.• The body was in the bath-room fully dressed, except as to his coat, which was found on a chair in the bed-room. The bed had not been slept on, thus indicating that death had supervened on the same day that he registered and went into the room. There were plain evidences of two wounds. One of these was in the cheek or jaw. The other was in the head, and had entered seemingly from the back, traversed the head and emerged in the forehead, almost between the eyes. The latter wound was the cause of death. The wound through the cheek or jaw was almost superficial. The latter wound had apparently entered from the front (though one witness says the powder-burn was around the rear entrance), passed through the angle of the jaw, emerged therefrom, cutting the collar in its passage, and from thence went into the bath-room door, where it was found embedded. The other bullet had passed through the head of assured almost horizontally, and emerging had struck the wall back of the bath-tub, glanced therefrom to the ceiling, which it struck and indented slightly, and then fell into the bath-tub, where it was found. The tissues surrounding the point of entrance of this fatal wound showed no appreciable powder-burn; though the cartridges were charged with smokeless power, which scorches, or burns, but does not blacken.

The pistol, a towel, and a piece of soap were found in the wash-basin, which was near the wall, right opposite the door. Above the wash-basin was a mirror, in dimensions about two feet one way and three the

other.  The pistol was a 38-caliber Colt's automatic of the model of 1907.  In order to fire this pistol initially, *or the first time,* it was necessary to cock it, which was done either by pulling the hammer back with the thumb, if it were already loaded; or by manipulating the outer shell or casing of the barrel, if it were not already loaded.  After it was once fired, the automatic mechanism operated by the force of the recoil, manipulated this outer casing, ejected the empty cartridge shell, throwing a loaded cartridge into the barrel and cocked it again, ready for firing upon mere pressure of the trigger.  I thus briefly restate the salient facts merely for convenience of reference.

That there is a presumption, or more correctly speaking, an inference (16 Cyc. 1050) against the fact of suicide, which applies to an otherwise unexplained violent death, there is no doubt.  I concede it, without stopping to examine whether ordinarily it is bottomed on any sort of logical grounds or not.  But I do insist that such a presumption cannot exist in the presence of evidence diametrically contradicting it.  And it cannot make any difference whether the evidence which contradicts and refutes the bare presumption is direct or circumstantial.  The moment explanatory evidence comes into the case the presumption dissolves into thin air and becomes as wholly non-existent as though it never had had existence.  Such evidence may consist of circumstances.  Of course, if these circumstances were such, or if these present so ambiguous an appearance, as logically to permit of two reasonable inferences, one showing suicide, and the other indicating an accident, there would be left in the case a question for the determination of the triers of fact.  For then the question would be, was it an accident, or was it suicide, as disclosed by the attending circumstances?  But this consideration has nothing to do with the presumption formerly existing.  This rule prevails whether there is or is not a presumption indulged. [Knorpp v. Wagner, 195 Mo. 1. c. 662.]

There can be no doubt here that the assured shot himself. Every fact shows it conclusively, and counsel admit it. The sole question is whether the two shots which were fired, one of which (manifestly the one through the head) caused assured's death, were fired accidentally or intentionally. So, it is urged that since there is a presumption against suicide, we are to use this presumption, not in the absence of evidence, for the case is full of circumstantial evidence, but in the presence of evidence, and in the very face of the evidence. In short, that we are to use such a presumption as evidence, to batter down and destroy all the fact evidence in the case. Absent the circumstances which point, to my mind, unerringly to suicide, there would be ground on which to apply the presumption against suicide. But it impresses me as a new departure in jurisprudence to use a bare presumption to destroy the plain evidence of all of the circumstances. Here these three circumstances point obviously to suicide: (a) The registering under an assumed name; (b) the firing of two shots, and (c) the necessity to cock the pistol designedly and intentionally before the first shot could be fired.

But it is urged by plaintiff (and as I read the majority opinion it follows this view in the spirit, if not to the letter) that having presumed that assured did not commit suicide, we may then go further, *without one scintilla of evidence,* and presume all other things necessary to rid the case of the physical facts which conclusively point to suicide. The registering under an assumed name is thus disposed of by presuming (without any evidence of the fact) that since assured was due shortly to call on some customers at Aliquippa, he had gone to the hotel in order to go over the arguments he would use in effecting the proposed sale to these Aliquippa customers, and that to this end he desired quiet and freedom from disturbance while formulating his supposed line of argument, yet the proof shows *aliunde* that assured had been in the business of selling the same line of goods for years,

and that his extreme efficiency and knowledge of the good points and value of his wares had won him repeated promotions, and was earning for him a very large salary. So, to my mind, this far-fetched presumption has nothing to commend it, except its ingenious and ingenuous novelty. It is a presumption evolved from a very able imagination, and having no basis of fact it is a guess of the boldest sort. It would seem to have been easier, and to have called for no greater strain upon the imagination, to have presumed that assured had gone to the hotel to invent a better method of making or burning the refractory clay products he was selling. His efficiency and his knowledge of the line of goods he was handling might aid the latter presumption; it negatives the former.

To escape the plain inference of suicide arising from the fact that two shots were fired, the argument of plaintiff is that while assured was in the bath-room he began playing with the pistol, whirling it around and around, and catching it. That while so playing with it, it was fired by accident, and the shot therefrom passed through the jaw or cheek of assured. That thereafter he became so excited that he dropped the pistol, which fell, struck the wash-basin, and was accidentally discharged, shooting deceased in the back of the head. This argument, or bold guess, is bottomed upon pure conjecture, and has no basis of evidence to support it. This pistol when it fell from the hand of assured into the wash-basin covered in its fall barely a foot of distance, if, as counsel assumed in argument, assured was seated while playing with the pistol. It fell upon a towel which was lying in the wash-basin, we are permitted to infer, because the towel was there, and certainly it was not put there after assured received the shot which caused his death. This presumption, or guess (for there is no evidence of the fact whatever), makes it necessary for assured while the pistol was falling barely a foot into the wash-basin, *to turn half way around, and throw his head back in a*

*position to be shot almost squarely through the head from the rear.*

I am impressed that in order to evade the plain circumstantial evidence of suicide, this process of conjecturing necessitates piling ,upon the initial presumption, or inference of fact, against suicide, these four presumptions (of none of which is there evidence): (a) that assured was sitting down playing with the pistol when it was first or initially discharged; (b) that he became so excited and confused from its explosion, and from the wound inflicted in his face that he dropped the pistol into the wash-basin; (c) that being loaded and cocked it accidentally discharged from the shock of falling into the wash-basin, and (d) while it was falling, and being dominated by continuing excitement, assured turned his head half way around in time and in such position as to receive the accidental shot in the back of his head. In short, having laid hold of the presumption against suicide, which the law indulges in cases of unexplained violent death, it is necessary then to add or pile on to this initial presumption of fact, four other presumptions, in the very face of the settled rule that one presumption may not be bottomed upon another. [Lawson, Presumptive Evidence, 652; 10 R. C. L. 870.] For not only is there no evidence, or circumstance, to show that the assured was sitting and idly playing with the pistol, when it was first fired, but the physical facts, to my mind, conclusively negative this view. This view leaves out of consideration the fact that is was necessary designedly to cock the pistol before it would fire the first shot. Both the pistol itself and the testimony show this fact conclusively. No one so far has presumed that assured was preparing to engage in target practice in that bath-room on this fatal morning, yet for some reason he intentionally cocked this pistol with his thumb, or by pulling back the outer casing thereof, before the first shot was fired. I need not enlarge upon the apparent impossibility of assured's being able to turn half way around, while the pistol was falling from his

hand into the wash-basin, a distance certainly of not more than a foot.

Unless we are now to hold that this presumption against suicide which is to be indulged in any case of unexplained death by violence is always of such evidentiary substance as to be in itself sufficient to take the case to the jury, it is in my opinion impossible to sustain this verdict. For the sustaining of it upon any other view, necessitates the drawing of four presumptions from and in order to sustain the initial one, which is forbidden. Likewise this view will logically result in sending any and every case to the jury when there is on the one side, plain and unmistakable evidence of suicide, and upon the other nothing but the bare presumption against suicide. And this presumption, instead of being drawn as an inference of fact from the unexplained violent death of a sane person, is, arbitrarily evolved not from the lack of evidence, but in the very face of all of the evidence. Apposite to the origin, office and nature of presumptions it was said in the case of Glick v. Railroad, 57 Mo. App. l. c. 104, this:

"The law is that a valid presumption must be based upon a fact, and not upon inference or upon another presumption. If the presumed fact has no immediate connection with, or relation to, the established fact from which it is inferred, it is regarded as too remote. [1 Rice on Evidence, p. 53, sec. 34; Lawson on Presumptive Evidence, p. 569, rule 118.] Or, as was said by Chief Justice REDFIELD: 'Presumptions must always rest upon acknowledged or well established facts, and not upon presumptions.' [Richmond v. Aiken, 25 Vt. 324; McAleer v. McMurray, 58 Pa. St. 126; U. S. v. Ross, 92 U. S. 283.]"

Likewise apposite is the language of Judge NORTONI, of the St. Louis Court of Appeals, in the case of Sowders v. Railroads, 127 Mo. App. l. c. 124, wherein it was said:

"All presumptions of fact proceed from other facts in proof (Lawson on Presumptive Evidence, 652), and supply an omitted fact in accord with the dictates

of human experience on like questions. They are therefore rebuttable or disputable as a matter of course. Inasmuch as such presumptions merely amount to an assumption of what may be true, as indicated by the probabilities and the rationale of experience, they may: be entirely overcome or removed from the case by competent proof going to supply the fact presumed. [Lawson on Presumptive Evidence, 559; 22 Am. & Eng. Ency. Law (2 Ed.), 1235-1236; Moreau v. Branham, 27 Mo. 351; Ham v. Barret, 28 Mo. 388.] And it is the well-established law that a presumption of fact will not be permitted to contradict or overcome facts actually proved. [Lawson on Presumptive Evidence, 659; Whitaker v. Morrison, 44 Am. Dec. 627; Morton v. Heidorn, 135 Mo. 608-617.]''

I think that both the authorities and the reason of the thing limit the inference (or presumption) of fact against suicide, to cases wherein the deceased was sane and the manner of his violent death is wholly unexplained either by direct or circumstantial evidence. In other words, such an inference is ephemeral, existing only so long as there is no evidence either in contradiction or corroboration of it. When such evidence is present, or when such evidence comes into the case, the presumption, or inference, goes out of it, leaving the matter thereafter to be resolved by the triers of fact, or by the court, solely upon the evidence, without the aid of any extrinsic presumption whatever. The obvious necessity of some method of determining whether an unexplained death is accidental or suicide, makes the indulging of a presumption against suicide a procedural requisite, without which in many cases no conclusion would be possible. When evidence comes in to explain the death, every necessity for the entertainment of the presumption instantly vanishes, and so we have held repeatedly. The obvious unfairness of any other rule is plain; likewise, the far-reaching evil effect of any other rule is plain. For, as already stated, the obvious logical effect of retaining the presumption after proof upon the fact comes in, would be to make

a case for the jury of every case wherein a presumption, or inference of fact, is required to be indulged. This is so because if such a presumption is real, substantial, and tangible, as to constitute evidence to be weighed in the case along with the real evidentiary facts, then no court could take any case from the jury wherein a presumption is required by law to be indulged. It is I think unfair because, after extracting the inference from the facts, we add it again to these same facts from which we first drew it and so beat down the contradicting evidentiary facts. [State v. Swearengin, 269 Mo. 177.]

Briefly summing up these rules, I think it should be held: (a) that the presumption against suicide is allowed only as a matter of procedural necessity; (b) that such a presumption has of itself, and in the presence of explanatory evidence of the facts, no evidentiary weight or substance whatever (Glick v. Railroad, supra; State v. Kennedy, 154 Mo. 268; State v. Hudspeth, 159 Mo. l. c. 209; Thayer, Treatise on Ev. at Com. Law, 314; 4 Wigmore on Ev., 2511; Peters v. Lohr, 24 S. D. 605; New London Comrs. v. Robbins, 82 Conn. 623; Clifford v. Taylor, 204 Mass. 358; State v. Reilly, 85 Kan. 175; Com. v. Sinclair, 195 Mass. 100; Culpepper v. State, 4 Okla. Crim. 103; State v. Lee, 69 Conn. 186; State v. Linhoff, 121 Iowa, 632; Lisbon v. Lyman, 49 N. H. 553) ; and (c) that it vanishes when prima-facie evidence of the true facts comes into the case. I think these conclusions are obvious, if not well-settled by the below cases and authorities. [Thayer, Treatise on Evidence at Com. Law, 314; Lawson, Presumptive Ev., 659; Glick v. Railroad, supra; Sowders v. Railroads, supra; Nixon v. Railroad, 141 Mo. l. c. 439; Reno v. Railroad, 180 Mo. l. c. 483; Bragg v. Railroad, 192 Mo. 331; Mockowik v. Railroad, 196 Mo. l. c. 571; State v. Swearengin, 269 Mo. 177; Lamport. v. Ins. Co., 272 Mo. 19.] In fact, it is fairly obvious that if such a presumption has of itself any evidentiary weight or sub-

274 Mo.—8.

stance after proof of the true facts comes in, it could not vanish upon that contingency.

Mr. Thayer, in his scholarly work cited above, says:

"Presumptions are aids to reasoning and argumentation, which assume the truth of certain matters for the purpose of some given inquiry. They may be grounded on general experience, or probability of any kind; or merely on policy and convenience. On whatever basis they rest, they operate in advance of argument or evidence, or irrespective of it, by taking something for granted; by assuming its existence. When the term is legitimately applied it designates a rule or a proposition which still leaves open to further inquiry the matter thus assumed. The exact scope and operation of these prima-facie assumptions are to cast upon the party against whom they operate, the duty of going forward, in argument or evidence, on the particular point to which they relate. They are thus closely related to the subject of judicial notice; for they furnish the basis of many of those spontaneous recognitions of particular facts or conditions which make up that doctrine. Presumptions are not in themselves either argument or evidence, although for the time being they accomplish the result of both. It would be as true, and no more so, to say that an instance of judicial notice is evidence, as to say that a presumption is evidence."

I dissent therefore because I am of the opinion that the evidence in this case shows as a matter of law that the death of assured could not have been accidental. [Richey v. Woodmen of the World, 163 Mo. App. 1. c. 247.] Because, the opinion held by the majority piles presumptions upon presumptions, absent any evidence or basis therefor, save and except that afforded by unbridled recourse to bare hypothesis. And because in the final analysis the effect of the majority opinion is to make of the presumption entertained a matter of evidence, which would result in shearing the courts of the power to declare that there is a lack of evidence in any

and every case where a presumption is by law required to be indulged, regardless of the quality or quantum of the evidence offered to contradict the presumption.

*Bond* and *Woodson, JJ.,* concur in these views.