# CARTER v. STANDARD ACC. INS. CO.

No. 4206.   Decided June 24, 1925.   (238 P. 259.)

1.  INSURANCE—STATUTE ELIMINATING SUICIDE AS DEFENSE APPLICA-
    BLE TO ACCIDENT INSURANCE COMPANIES.   Comp. Laws 1917,
    § 1171, eliminating suicide of policy holder of any "life insur-
    ance company" after first policy year, as defense against pay-
    ment of "life insurance policy," applies to accident insurance
    companies insuring lives; Acts 1921, c. 29, differentiating be-
    tween life and accident insurance companies for other purposes.

2.  INSURANCE—EVIDENCE OF SUICIDE IN REBUTTAL OF PRIMA FACIE
    CASE OF ACCIDENTAL DEATH BARRED BY STATUTE.   When plaintiff,
    in action on accident insurance policy, after first policy year
    makes prima facie case of accidental death of insured, Comp.
    Laws 1917, § 1171, bars evidence of suicide in rebuttal, though
    intentional and deliberate taking of one's own life, while sane,
    by whatever means, is not accident, it being court's duty to give
    statute some effect, if possible, within Legislature's plain mean-
    ing and intent.

3.  APPEAL AND ERROR—CONTENTION THAT INSURED DIED WITHIN
    FIRST YEAR OF POLICY NEED NOT BE CONSIDERED WHERE FIRST
    RAISED ON APPEAL.   Whether policy was issued for one year
    only and subsequent annual payments of premiums and re-
    ceipts therefor consummated new contracts, so that insured
    died within first year of policy, within exception of Comp.
    Laws 1917, § 1171, eliminating suicide as defense need not be
    considered, where first raised in brief of amicus curiae on ap-
    peal, and record, of which policy bearing date negativing such
    contention was part, contained no suggestion that any other
    policy was issued.

4.  INSURANCE—"FIRST POLICY YEAR" IN STATUTE ELIMINATING
    SUICIDE AFTER SUCH YEAR AS DEFENSE MEANS YEAR FOR WHICH
    POLICY ANNUALLY RENEWED WAS FIRST ISSUED.   "First policy
    year," in Comp. Laws 1917, § 1171, eliminating suicide of in-
    sured after such year as defense, means year for which policy,
    annually renewed, was first issued.

5.  APPEAL AND ERROR—FINDING OF NO SUBSTANTIAL EVIDENCE WAR-
    RANTING INFERENCE BY JURY NECESSARY TO· JUSTIFY REVERSAL FOR
    INSUFFICIENCY OF EVIDENCE TO SUSTAIN VERDICT.   To justify
    reversal for insufficiency of evidence to sustain verdict for
    plaintiff, in action on policy insuring against death by acci-

dental means, court must find, as matter of law, that there was no substantial evidence warranting inference that death was caused by such means.

6. INSURANCE—PRESUMPTION AGAINST SUICIDE OVERCOME BY CIRCUMSTANTIAL EVIDENCE ONLY IF SUCH AS TO NEGATIVE EVERY REASONABLE INFERENCE OF ACCIDENTAL DEATH. In action on accident policy, where it is shown that death must have been accidental or suicidal, presumption against suicide can be overcome by circumstantial evidence only if it is of such quality and weight as to negative every reasonable inference of death by accident.

7. INSURANCE—VERDICT OF DEATH BY ACCIDENTAL MEANS HELD SUSTAINED BY EVIDENCE. In action on accident policy, evidence *held* to sustain verdict that insured's death was caused by accidental means, not by intentional suicide.

8. INSURANCE—RECOVERY FOR "ACCIDENTAL DEATH" HELD NOT PRECLUDED BY POLICY INSURING AGAINST "DEATH BY ACCIDENTAL MEANS." Policy insuring against death by "accidental means" *held* not to preclude recovery for "accidental death" from overdose of laudanum intentionally taken to induce sleep; there being no substantial distinction between "accidental death" and "death by accidental means." [1]

9. PLEADING—ALLEGATION OF POSSIBLE CAUSE OF INSURED'S DEATH HELD NOT BINDING ADMISSION. Allegation of complaint, in action on accident policy, that insured's death occurred in one or both of certain circumstances, one of which was that he accidentally took overdose of laudanum, *held* not positive admission, conclusively binding plaintiff, that he took such overdose.

10. EVIDENCE—HYPOTHETICAL QUESTION AS TO CAUSE OF INSURED'S DEATH HELD NOT OBJECTIONABLE AS NOT STATING FACT INFERABLE FROM CIRCUMSTANCES STATED. In action on accident policy, hypothetical question to physicians as to cause of insured's death *held* not objectionable, as not stating that he took overdose of laudanum, where all circumstances from which such fact, which was not directly testified to, could be inferred, were stated.

11. APPEAL AND ERROR—INCOMPLETENESS OF HYPOTHETICAL QUESTION HELD HARMLESS, IN VIEW OF LATITUDE ALLOWED APPELLANT'S

---

[1] *Richards* v. *Standard Acc. Ins. Co.*, 58 Utah, 622, 200 P. 1017, 17 A. L. R. 1183; *Armstrong* v. *Insurance Co.*, 41 Utah, 112, 124 P. 518.

COUNSEL ON CROSS-EXAMINATION. Where insurer's counsel exercised widest possible latitude on cross-examination of expert respecting cause of insured's death, as appeared from facts and circumstances in evidence up to such time, error, if any, in hypothetical question, not stating that he had taken overdose of laudanum, was harmless.[2]

CHERRY, J., dissenting in part.

Appeal from District Court, Third District Salt Lake County; *Wm. M. McCrea,* Judge.

Action by Josephine Young Carter against the Standard Accident Insurance Company. Judgment for plaintiff, and defendant appeals.

AFFIRMED.

*Ray Van Cott* and *A. E. Moreton,* both of Salt Lake City, for appellant.

*Booth, Lee, Badger, Rich & Rich* and *D. N. Straup,* all of Salt Lake City, for respondent.

THURMAN, J.

The plaintiff instituted this action to recover the sum of $7,500 and interest thereon, alleged to be due on an accident policy issued by the defendant to her husband, Charles Smith

[2] *Johanson* v. *Huntsman,* 60 Utah, 402, 209 P. 197.
Headnote 1.   1 C. J. p. 444.
Headnote 2.   1 C. J. p. 444.
Headnote 3.   3 C. J. pp. 696, 703.
Headnote 4.   1 C. J. p. 444, 37 C. J. p. 555.
Headnote 5.   4 C. J. p. 855.
Headnote 6.   1 C. J. p. 495.
Headnote 7.   1 C. J. p. 504.
Headnote 8.   1 C. J. p. 425.
Headnote 9.   31 Cyc. p. 87.
Headnote 10.   22 C. J. p. 711.
Headnote 11.   4 C. J. p. 967, 22 C. J. p. 712.

Carter, in which policy plaintiff is named as the beneficiary in case of death.

The complaint in substance, alleges that the policy was issued to Carter on the 30th day of March, 1915, insuring him for a period of 12 calendar months against "loss resulting from bodily injuries, effected directly, exclusively, and independenly of all other causes through external, violent, and accidental means, except when intentionally self-inflicted, while sane or insane, in the sum of $7,500 as provided in the policy." It is then alleged that the policy was annually renewed thereafter on payment of the same sum upon each renewal, and that the policy was thereby duly and regularly continued in force until the 30th day of March, 1923, all of which renewal payments were paid by the said Carter and received by the defendant.

It is then alleged that on the 13th day of September, 1922, at Salt Lake City, Utah, Carter died, through accidental means, the manner of his death being alleged in the terms employed in the policy as above set forth. In addition thereto the plaintiff alleges that the "exact cause of his death is unknown, except that it occurred in either one or the other or both of the following causes and circumstances, to wit." Plaintiff then alleges, in substance, that for several days previous to his death deceased had been confined to his room in the Wilson Hotel on account of sickness which caused him to become weak and dizzy while standing on his feet; and that on said 13th of September, 1922, between the hours of 10 a. m. and 4 p. m. he had occasion to get up from his bed in said hotel to go into an adjoining room towards the telephone installed therein, and while standing near said telephone in said room he fell to the floor with such force and violence that he instantly died, and was found under the telephone on the floor, reclining upon his back, on the afternoon of said date.

In the alternative, plaintiff alleges the same condition of deceased as to being sick, weak, and dizzy, and in addition thereto alleges that he suffered from insomnia; that he was frequently unable to sleep without the use of medicine; that

for that purpose he frequently took small quantities of laudanum, and had made it a practice to carry laudanum with him for several years in a small bottle; that on the date of his death he had in his possession a 2-ounce bottle partly filled with laudanum, which he had obtained several months prior, and from time to time had used therefrom when afflicted with insomnia. Plaintiff then alleges upon her information and belief that deceased on the said date was afflicted with insomnia, that he attempted to take a small quantity of said laudanum to induce sleep, as was his custom, and in so doing he accidentally took an overdose, as a result of which he died, the deceased, however, not intending to inflict an injury upon himself.

The foregoing are the only allegations of the complaint material on this appeal.

The defendant, answering, admitted the issuance of the policy, the renewal thereof, the payment and receipt of the annual payments, and the continuance of the policy in force down to the date of the death of deceased as alleged in the complaint. It also admits the death of deceased on the date alleged, but denies that his death was accidental or by accidental means in either form as alleged in the complaint, but on the contrary as a separate answer and defense, defendant alleges that the death of deceased was "intentionally self-inflicted by said deceased while sane or insane, by his taking internally, knowingly, and intentionally, poison, to wit, laudanum, on September 13, 1922, in a large quantity, sufficient to cause death, and with the intention and purpose, as this defendant is advised and believes and therefore alleges, of causing his own death, and that said poison so taken did cause his death on said 13th day of September, 1922."

The jury to whom the case was tried rendered a verdict for the plaintiff for the amount prayed for in the complaint; motion for new trial was denied, and judgment entered. From the judgment so entered the defendant appeals.

The case was submitted to the jury upon the issues presented by the pleadings as above set forth, with instructions

by the court applicable to the issues thus presented.

In the argument on motion for a new trial, respondent resisted the motion, not only upon the grounds that there was evidence to prove that the death of the deceased was caused by accidental means within the terms of the policy, but that the statute (Comp. Laws Utah 1917, § 1171), eliminating suicide as a defense was controlling, and therefore in any event the motion for a new trial should be denied. The statute referred to will hereinafter be quoted and considered in connection with the respective contentions of the parties concerning the same.

The motion for a new trial was denied.

It is not our intention at this stage of the opinion to enter into a detailed statement of the evidence. For our present purpose it is sufficient to say that on the 13th day of September, 1922, the insured, Charles Smith Carter, hereinafter called Carter, was found dead in his room, No. 142 at the Wilson Hotel, Salt Lake City, Utah, under such circumstances as to engender a controversy between plaintiff and defendant as to whether his death was caused by accidental means, or whether he had deliberately and intentionally committed suicide.

As hereinbefore suggested, at the argument on motion for a new trial respondent invoked the statute, Comp. Laws Utah 1917, § 1171, as conclusive reason why the motion for a new trial should be denied. Upon that question amicus curiæ have appeared upon each side of the question, by permission of the court, and filed exhaustive and illuminating briefs. As the parties litigant respectively have adopted the briefs so filed, for the sake of brevity such briefs will be referred to as "appellant's brief" and "respondents's brief," and counsel presenting them will be referred to as "appellant's counsel" and "respondent's counsel."

The statute referred to reads as follows:

1171. "From and after the passage of this chapter, the suicide of a policy holder after the first policy year of any life insurance company doing business in this state shall not be a defense against the payment of a life insurance policy, whether said suicide was vol-

untary or involuntary and whether said policy holder was sane or insane."

Appellant's counsel discuss the question under four heads in substance as follows: (1) The statute has no application to an accident insurance policy. (2) Notwithstanding the statute, the suicide of the holder of an accident insurance policy, while sane, is not an accident, and therefore not a death from which a recovery can be had. (3) The burden of proof was on the respondent to show that the death of the insured was effected directly and independently of all other causes through external, violent, and accidental means. (4) The policy in question was issued for one year only; every renewal thereafter was a new contract, and therefore the defense of suicide is available under any construction of section 1171, because the insured died within the first policy year of the policy.

The argument of appellant's counsel under every head above set forth in effect goes to the point that the statute has no application to an accident insurance policy. Various statutes of the state relating to insurance and insurance companies are reviewed, comparisons made, and distinctions pointed out relating to the different classes of insurance and insurance companies. It suits our convenience for the present to reserve this phase of the argument for later consideration.

There appears to be only two other states of the Union with statutes in any respect similar to the Utah statute above quoted, viz., Missouri and Colorado. The Utah and Colorado statutes are identical in every particular. The Missouri statute was passed in 1879, and reads as follows:

"In all suits upon policies of insurance on life hereafter issued by any company doing business in this state, to a citizen of this state, it shall be no defense that the insured committed suicide, unless it shall be shown to the satisfaction of the court or jury trying the cause, that the insured contemplated suicide at the time he made his application for the policy, and any stipulation in the policy to the contrary shall be void." Rev. St. 1919, § 6150.

The Colorado statute (C. L. 1921, § 2532), as it now reads was enacted in 1907, and the Utah statute in 1909.

As far as this court is concerned the question presented here is one of first impression. A somewhat similar question involving an interpretation of the Utah statute has recently been decided in favor of respondent's contention here by the United States Circuit Court of Appeals, on appeal from the United States District Court for the District of Utah. *Continental Casualty Co. et al.* v. *Alfred W. Agee, Adm'r, etc.,* U. S. Circuit Court of Appeals, Eighth District, No. 6718, Dec. Term, 1924, 3 F. (2d) 978. Defendant in error, plaintiff below, instituted several actions to recover the principal sums upon five different policies of insurance issued by four different companies insuring the life of Robert G. Agee against death by accident. The cases were afterwards consolidated for trial. At the trial of the case the court directed a verdict in favor of the plaintiff. From the judgments rendered upon the verdict defendants appealed. The defendants offered evidence tending to prove that Robert G. Agee, the insured, committed suicide while sane, but the offered evidence was rejected by the court. The Circuit Court of Appeals states the main question to be "the effect of a statute of Utah excluding the defense of suicide in certain actions upon life insurance policies." It appears from a statement of the facts made by the court that Robert G. Agee was a resident of Ogden, Utah, and on July 19, 1922, went with four of his children to a bathing resort known as the Utah Hot Springs. He entered one of the bathing pools, and his children entered another. About an hour afterwards his children became alarmed, and a search was made. His body was found dead on the bottom of one of the bathing pools in about four feet of water. Physicians testified that the immediate cause of his death was drowning. The insurance policies were not in dispute, and the stipulations in the policies as to loss against death were substantially the same as in the instant case. The evidence offered in the court below was rejected because of the provision of the statute in question here. The statute is quoted in the opinion. The contention of the insurance companies was that they were not "life insurance companies within the meaning

of the statute, but accident insurance companies.'' To this
contention the court replies:

"An insurance company, which may be properly called an acci-
dent insurance company, because such insurance is the main or
characteristic form of insurance afforded by it, may also be a life
insurance company, because it insures against the death of the
insured, even though the scope of such insurance is somewhat
limited."

In support of this view the court cites *Logan* v. *Fidelity
& Casualty Co.*, 146 Mo. 114, 122, 47 S. W. 948; *Zimmer*
v. *Central Acc. Ins. Co.*, 207 Pa. 472, 475, 56 A. 1003;
*Officer* v. *London Guar. & Acc. Co.*, 74 Colo. 217, 219,
220 P. 499; *Knights Templar & Masons' Life Indemnity Co.*
v. *Berry*, 50 F. 511, 513, 1 C. C. A. 561; *Modern Brother-
hood of America* v. *Lock*, 22 Colo. App. 409, 411, 125 P.
556. The opinion then continues:

"The statute applies to 'any life insurance company doing busi-
ness in the state,' and no valid reason has been suggested to show
that the Legislature intended to abolish the defense of suicide
if attempted by a company making life insurance its principal
business, but to leave such defense open when offered by a company
effecting insurance on lives, provided such a form of insurance is
not its principal business."

The cases above cited and relied on by the Circuit Court
of Appeals appear to support the view expressed by the
court, except the Berry Case, 50 F. 511, 1 C. C. A. 561,
which seems to have been a case of straight life insurance
by a company engaged exclusively in life insurance although
not named as such.

Appellant's counsel conceive some significance in the fact
that the Utah Legislature in 1921 (chapter 29) passed an
act classifying insurance companies, designating them as
''life insurance companies,'' ''accident insurance companies,''
etc., and assigning to each separate and distinct
functions characteristic of the different kinds of busi-
ness in which it was engaged. The argument would
be far more persuasive if it were made to appear that in
case of death covered by their respective policies the statute
referred to had created a difference as to liability in respect

to their obligations. Each of said companies insures against death according to the terms of its policy. To that extent it is a life insurance company, under whatever name it carries on its business. We are unable to find any provision in the late act referred to that in any manner affects the question under review.

The statute of 1921 was brought to the attention of the Circuit Court of Appeals in the Agee Case, supra, and to all appearances the same argument made thereon by appellant as is now being made by appellant's counsel in the case at bar. But that court, after stating the evident purpose of the statute, closed the discussion by saying:

"Notwithstanding a differentiation between life insurance companies and accident insurance companies is indicated by these provisions of the statutes, for the purpose of fixing the amount of their capital stock or the form of an ordinary life insurance contract, we do not consider that they require that the words 'life insurance company' in section 1171 should not be applied to accident insurance companies, when they also write insurance upon lives."

Appellant's counsel also rely on the following cases: *Casualty Co.* v. *Dorough,* 107 F. 389, 46 C. C. A. 364; *Insurance Co.* v. *Parker,* 96 Tex. 287, 72 S. W. 168, 580, 621; *Insurance Co.* v. *Lokey,* 166 Ala. 174, 52 So. 45; *Pride* v. *Casualty Co.,* 69 Wash. 428, 125 P. 787; *Insurance Co.* v. *Dobler,* 137 F. 553, 70 C. C. A. 134; *Baumann* v. *Insurance Co.,* 225 N. Y. 480, 122 N. E. 628. We cite the cases without comment, except to say they fail to disclose any reason why section 1171 of the Utah statute should not apply to accident insurance companies to the extent that they are engaged in the business of insuring lives.

The next proposition relied on by appellant's counsel is that, notwithstanding the statute (section 1171), the suicide of the holder of an accident insurance policy, while sane, is not an accident, and casts no liability upon the insurer.

If the term "suicide," as used in the above proposition, means the act of one intentionally and deliberately taking his own life, by whatever means employed, the writer is of opinion the proposition is incontrovertible. When a thing is done with the intention of producing a certain effect, and

it produces the effect intended, it cannot afterwards be consistently contended that the effect produced was an accident. The proposition is sustained by the authorities referred to by appellant's counsel and cases cited in the opinions. *Williams* v. *U. S. Mutual Acc. Ass'n,* 133 N. Y. 366, 31 N. E. 222; *Ætna Life Ins. Co.* v. *Vandecar,* 86 F. 282, 30 C. C. A. 48; *Tuttle* v. *Iowa State Traveling Men's Ass'n,* 132 Iowa, 654, 104 N. W. 1131, 7 L. R. A. (N. S.) 223; *Accident Ins. Co.* v. *Crandall,* 120 U. S. 527, 7 S. Ct. 685, 30 L. Ed. 740; *Brunswick* v. *Standard Acc. Ins. Co.,* 278 Mo. 154, 213 S. W. 45, 7 A. L. R. 1213; *Scales* v. *National Life & Acc. Ins. Co.* (Mo. Sup.) 212 S. W. 8; *Andrus* v. *Business Men's Ass'n,* 283 Mo. 442, 223 S. W. 70, 13 A. L. R. 779; *Aufrichtig* v. *Columbia Nat. Life Ins. Co.,* 298 Mo. 1, 249 S. W. 912; *Landau* v. *Pacific Mut. Life Ins. Co.* (Mo. Sup.) 267 S. W. 370; *Caldwell* v. *Traveler's Ins. Co.* (Mo. Sup.) 267 S. W. 907.

The rule is not only supported by abundant authority, but by plain reason and common sense. But appellant's counsel in their brief say:

"We contend that there is nothing in the Utah statute, under any construction, which would convert a sane suicide into an accident, and justify a recovery under a policy insuring only against accidental death. If it is essential to a recovery, and it must be so, that proof be made that the insured died as the result of an accident, in accordance with the insurance contract, *then upon what theory can the insurer be denied the right to prove that the death of the insured was not accidental?*"

We have italicized for emphasis the latter part of the language last quoted, for in our opinion it raises the question which constitutes the real crux of the controversy concerning the meaning of section 1171. The same question was presented in the Agee Case, supra, in the United States Circuit Court of Appeals. That court stated the question and answered it, on page 979 of the opinion, as follows:

"In support of the assignment of error relating to the rejection of evidence, the plaintiffs in error contend that the insurance policies granted protection to the assured only from death by accidental injuries, and that evidence should have been received to show his intentional suicide while sane, because such a suicide was not an accident. It may be conceded that, if it were not for the provisions

of the Utah statute, this contention would be well supported (*Tuttle* v. *Iowa State Traveling Men's Ass'n*, 132 Iowa 652, 654, 104 N. W. 1131, 7 L. R. A. (N. S.) 223; 16 A. L. R. p. 1404), but this statute is explicit that the suicide of the policy holder shall not be a defense whether said suicide was voluntary or involuntary and whether said policy holder was sane or insane. The statute, on familiar rules of construction, entered into and became a part of every life insurance contract effected after its enactment by companies doing business in Utah. *Jarman* v. *Knights Templars' & Masons' Life Indemnity Co.* (C. C.) 95 F. 70, 73; Bishop on Contracts, § 439."

We assume from reading the statement of facts in that case that when the plaintiff proved the circumstances attending the death of the insured, and that it resulted from drowning the presumption at once arose that the death was accidental because the circumstances indicated it was not a natural death, and likewise excluded the presumption of suicide. So that, as the case then stood, the presumption was that it was an accidental death. *Brunswick* v. *Standard Acc. Ins. Co.*, 278 Mo. 154, 213 S. W. 45, 7 A. L. R. 1213, and cases cited therein; *Reynolds* v. *Maryland Casualty Co.*, 274 Mo. 83, 201 S. W. 1128, and cases cited. At that point in the trial plaintiff evidently rested his case, and the defendant sought to prove that the death was suicidal in order to rebut the presumption that it was accidental. Objection was made, based upon the provision of section 1171, and the objection was sustained. It seems to the writer that such was a proper time and a proper occasion for the application of the statute in an accident insurance case. After the plaintiff has made a prima facie case of accidental death, to then permit the defendant to prove the death was suicidal in order to rebut the proof of accidental death would be to "fly in the very teeth of the statute," and render it useless for the purpose for which it was evidently intended. Some of the reasons for the passage of the statute are stated in respondent's brief, in language which we take the liberty of quoting:

"The reasons for the enactment of these statutes are most cogent. It is a matter of common knowledge that, where a policy holder meets death by violence, in the absence of an eyewitness,

it is impossible in many cases to determine with any degree of certainty whether he has died 'by his own hand' or by mere accident, and if 'by his own hand,' whether at the time he was sane or insane. Accident insurance companies in nearly every instance take advantage of such circumstances, and refuse to pay, on the ground that death was not accidental, thus casting upon the beneficiary the burden of proving that the deceased did not destroy his own life, or if he did, that he was at the time insane. Often this, though true, could not be proven, where there were no eyewitnesses to his dath. This enabled the insurer, no doubt, in many cases, to unjustly escape liability. These statutes were intended to prevent such injustice, and should be strictly enforced."

As far as accident insurance companies are concerned appellant's counsel, in effect, contend for the same rights now, in respect to the admission of evidence, as was available to such companies prior to the enactment of the statute. It is the duty of this court to give to the statute some effect, if possible, within the plain meaning and intention of the Legislature which enacted it.

As to the particular question now under review, the court is of opinion that when the plaintiff in an accident insurance case, based upon a policy similar to the one in the case at bar, makes a prima facie case of accidental death, the statute is a complete bar to the defendant offering any evidence tending to prove that the insured intentionally and deliberately took his own life. By such an interpretation we give to the statute some force and effect, and that, too, without ignoring or disregarding any lawful stipulation contained in the policy.

We cannot, without extending this opinion to an unreasonable length, review the cases last referred to by appellant's counsel. In any event, if there is any conflict between our views and the decisions referred to, with all due respect for the decisions of a sister state we must decline to follow them.

It follows, therefore, that this court does not agree with counsel for appellant, that after a prima facie case is made by plaintiff of death by accident, the defendant may be permitted to introduce evidence of suicide in rebuttal.

Before concluding our opinion concerning this question we

will briefly review two Missouri cases involving an interpretation of the Missouri statute, which cases have been the fruitful source of much speculation and confusion. *Logan* v. *Fidelity & Casualty Co.*, 146 Mo. 114, 47 S. W. 948; *Whitfield* v. *Ætna Life Ins. Co.*, 205 U. S. 489, 27 S. Ct. 578, 51 L. Ed. 895. Both of them were actions to recover upon accident insurance policies. In the Logan Case the plaintiff alleged the death as accidental. The defendant answered, alleging it was suicidal. During the course of the trial the defendant's counsel stated he desired that "this case to go up on the question as to whether or not the suicide statute makes suicide a defense in a case of this kind. and applies to a policy such as this, and if so then the jury should be instructed to find for plaintiff." Counsel further proposed to withdraw all objections to the proof of death, and admit for the purpose of the trial that the proof of death was furnished and notice given. The trial court then said:

"Your position is that if section 5855 of the statute applies to this kind of a policy, then under the testimony in this case the plaintiff is entitled to recover, otherwise not."

Defendant's counsel responded:

"That is it precisely. That narrows it down so that the case will be stripped of all technicalities as to evidence."

Upon this stipulation the trial court directed a verdict for the plaintiff. Judgment was entered and defendant appealed. The Supreme Court of Missouri, in order to bring the question within the purview of the suicide statute, stated the question in the following language:

"Is suicide in this state a valid defense to an action upon a policy of insurance issued by an accident insurance company, containing provisions such as the one in controversy, where it is not shown that the insured contemplated suicide at the time he made his application for the policy (and it being admitted that the insured afterwards came to his death from the external, violent, and accidental means)?"

The court affirmed the judgment in a remarkably strong opinion. Without commenting on the case it will be seen at a glance that the case not only holds that accident in-

surance cases are within the suicide statute, but also that where accidental death is admitted (or proven) suicide is no defense.

In the Whitfield Case the question, in effect, was whether suicide was a defense, notwithstanding certain provisions in the policy, where it does not appear that the insured contemplated suicide at the time he made application for the insurance. The provisions in the policy were to the effect that, in case of suicide by the insured, the beneficiary could only recover one-tenth of the principal sum. The Circuit Court of Appeals of the United States, Eighth Circuit (144 F. 356, 75 C. C. A. 358), had held that the policy was not forbidden by the suicide statute, and judgment was entered for defendant. On certiorari the case was carried to the Supreme Court of the United States, which reversed the judgment. Mr. Justice Harlan delivered the opinion of the court, in the course of which he said:

"If, notwithstanding the statute, an insurance company, may by contract, bind itself, in case of the suicide of the insured, to pay only one-tenth of the principal sum, may it not lawfully contract for exemption as to the whole sum or only a nominal part thereof, and if sued, defeat any action in which a recovery is sought for the entire amount insured? In this way the statute could be annulled or made useless for any practical purpose. Looking at the object of the statute, and giving effect to its words, according to their ordinary, natural meaning, the legislative intent was to cut up by the roots any defense, as to the whole and every part of the sum insured, which was grounded upon the fact of suicide. The manifest purpose of the statute was to make all inquiry as to suicide wholly immaterial, except where the insured contemplated suicide at the time he applied for his policy. Any contract inconsistent with the statute must be held void."

The Whitfield Case, as analyzed and disposed of by Mr. Justice Harland, appears to proceed upon the theory that suicide of the insured is not available as a defense, unless it appears that the insured contemplated suicide when he made application for the insurance. This being the basis of the opinion, the holding of the court seems to be clearly within the literal meaning of the Missouri statute.

Recent accident insurance cases, especially the last six

Missouri cases cited by appellant's counsel, lay no stress upon whether the insured contemplated suicide when he applied for the insurance. The court holds that intentional suicide is not a death by accidental means and therefore, not within the terms of the policy. As a consequence of such holding the defense of intentional suicide is permitted in accident insurance company cases entirely regardless of the suicide statute.

The restrictive language of the Utah statute, which is radically different from that of the Missouri statute, renders it impossible for this court to adopt the interpretation applied to the Missouri statute.

The policy in this case insures against ''loss resulting from bodily injuries effected directly, exclusively, and independently of all other causes through external, violent and accidental means, except when self-inflicted while sane or insane.''

The Utah statute says:

"Suicide  *  *  *  shall not be a defense against the payment of a life insurance policy, whether said suicide was voluntary or involuntary and whether said policy holder was sane or insane."

The statute in emphatic and unmistakable language nullifies the above quoted terms of the policy, and supplies a remedy for the mischief resulting therefrom. The most plausible argument urged by the Supreme Court of Missouri, in holding that intentional suicide in accident cases is not within the statute, is that the statute should not be interpreted as creating for the insured a new cause of action. Such argument, clearly, cannot be controverted by those who take the position that intentional suicide is an accident. It has little, if any, force, however, if it be held that plaintiff has the burden of establishing a prima facie case of death by accidental means. When that is accomplished the defense of suicide, whether intentional or otherwise, is not permissible.

Appellant's third proposition is that the burden of proof was on the respondent. We have already stated that the plaintiff must first make a prima facie case of accidental death. That is all that is necessary as far as the burden of

Appeal from Third District

proof is concerned. If suicide of the insured is the only de-
fense, the plaintiff is entitled to recover, if the statute is to
have any force or effect in this class of cases.

The fourth and last proposition of appellant's counsel,
involving the interpretation of the statute, is that, "the in-
sured died within the first year of the policy." Under this
head it is contended that the policy was issued for one year
only, and that subsequent payments of premiums annually
and receipts therefor by the defendant did not continue the
first policy in force, but each payment and receipt annually
was in effect a new contract of insurance. For that reason
appellant's counsel contend the insured died before the ex-
piration of the first year of the policy. The question is
raised for the first time in this court.

Appellant filed a general and special demurrer to the
complaint. The special demurrer does not specify the point
now raised by appellant's counsel as grounds of demurrer.
The demurrer was overruled. The overruling of the de-
murrer was not assigned as error. The demurrer was not
printed in the abstact, and no reference is made to it or the
ruling of the court thereon in appellant's original brief, or
its reply to respondent's brief. It is raised for the first time
in the brief of amicus curiæ, appearing as appellant's
counsel.

These remarks are not made by way of criticism, but for
the purpose of emphasizing a certain fact arising upon the
pleadings. The first paragraph of the complaint alleges the
corporate existence of the defendant. The second paragraph
alleges, in effect, that on the 30th day of March, 1915, at Salt
Lake City, Utah, Carter paid the defendant the sum of $25,
and defendant, in consideration therefor, delivered to him
its policy of insurance, insuring him against loss from bodily
injuries, etc., for a period of 12 calendar months from the
above date. The third paragraph is as follows:

"That said policy of insurance was annually duly renewed from
time to time by the said defendant in consideartion of the pay-
ment of the additional sum of twenty-five and no-100 ($25.00) dol-
lars, upon each renewal thereof, and by said renewals said policy
of insurance was duly and regularly continued in force till noon

on the 30th day of March, 1923, standard time, and all of which premiums continuing and renewing said policy the said defendant received, and which were paid by the said Charles Smith Carter, the insured as aforesaid.''

The answer admits each of said paragraphs as alleged in the complaint. Carter died on the 13th day of September, 1922. The case was tried on the issues made by the pleadings, and at no time from the commencement to the end of the trial was the point ever made that the death of Carter occurred within the first year of the policy. In these circumstances it does seem to the court that the fourth and last point raised by appellant's counsel presents a moot question merely, and one that ought not to be decided in the instant case. For the purposes of this case we feel impelled to hold that the policy, issued to the insured in March, 1915, was continued in force until March, 1923, and **3** was in force at the time of Carter's death. The conduct of the parties from the commencement of the action down to the filing of the brief of amicus curiæ, as above stated, strongly indicates that the parties themselves construed their pleadings in accordance with the views we have expressed.

Besides all this, the policy upon which the action was brought is made part of the record, marked Exhibit A, and bears date of execution March 30, 1915. There is no suggestion anywhere in the record that any other policy was ever issued. So that as far as concerns the instant case the question here raised by appellant's counsel is not in issue, and may well be disposed of as was a similar question by the United States Circuit Court of Appeals in the Agee Case, supra, on page 11 of the opinion. That court held that the question was not within the issues. But as counsel for both appellant and respondent have evidently given the question much consideration, and filed exhaustive briefs in support of their respective contentions, we have concluded to pass upon the merits of the question, notwithstanding the condition of the record and the conduct of the parties, to which we have referred.

Both appellant's and respondent's counsel have cited many cases relating to the effect of the renewal and continuation of different kinds of insurance policies, as to whether they are to be treated as new policies or continuations of old ones, but unfortunately none of them touch the meat of the question presented here. We shall cite the cases, or most of them, but shall not undertake to review them, for what we have written has already extended beyond the limits of an ordinary opinion, and we have not yet considered any one of the assignments of error, of which there are 59 in number. It is probable, however, that many of the errors assigned have been in effect disposed of by what has been said in the preceding pages of the opinion. The following cases are relied on by appellant's counsel: *Mutual Benefit Life Ins. Co.* v. *Robertson,* 59 Ill. 123, 14 Am. Rep. 8; *Brady* v. *Northwestern Ins. Co.,* 11 Mich. 425; *Hartford Co.* v. *Walsh,* 54 Ill. 564, 5 Am. Rep. 115; *Pacific Mut. Life Ins. Co.* v. *Vogel,* 232 F. 337-340, 146 C. C. A. 385; *Sturm* v. *Employers', etc., Corp.,* 212 Ill. App. 354; *Commercial Bank* v. *American Bonding Co.,* 194 Mo. App. 224, 187 S. W. 99; *Brawner* v. *Royal Indemnity Co.,* 246 F. 637, 158 C. C. A. 593.; *Steele* v. *Indemnity Co.,* 158 Minn. 160, 197 N. W. 101; *Slokel* v. *Heywood* (Eng. Ch.) 1 Chancery Div. (Law Rep. Apr. 1, 1897) 459; *Hodgson* v. *Preferred Acc. Ins. Co.,* 100 Misc. Rep. 155, 165 N. Y. S. 293. See, also, 3 Joyce on Insurance (2d Ed.) § 1463.

Respondent's counsel rely on the following: *Silliman* v. *Life Ins. Co.,* 131 Tenn. 303, 194 S. W. 1131, L. R. A. 1915F, 707; *Arrowsmith* v. *Ins. Co.,* 164 Ill. App. 44; *Monahan* v. *Ins. Co.,* 242 Ill. 488, 90 N. E. 213, 134 Am. St. Rep. 337; *Seymour* v. *Protective League,* 155 Ill. App. 21; *Marshall* v. *Modern Order, etc.,* 184 Ill. App. 224-231; *Goodwin* v. *Life Ass'n,* 97 Iowa, 226, 66 N. W. 157, 32 L. R. A. 473, 59 Am. St. Rep. 411; *Lindsey* v. *Aid Society,* 84 Iowa, 734, 50 N. W. 29; *Wadsworth* v. *Jewelers', etc., Co.,* 132 N. Y. 540, 29 N. E. 1104; *Massachusetts Ben. L. A.* v. *Robinson,* 104 Ga. 256, 30 S. E. 918, 42 L. R. A. 261.

Appellant's counsel, after referring to authorities relat-

ing to regular life insurance companies as contradistinguished from accident insurance companies state their position as follows:

"If the policy involved here had been such a life insurance policy on the life of Carter, for a term beginning with the date of the execution of the original accident policy, and extending for a period beyond the date of the death of Carter, the policy remaining in effect unless the insured failed to pay the annual premium provided, there could be no question but that Carter did not die within the first policy year, but, with respect to the accident policy, we respectfully submit that the contract which insured Carter against death by accident involved in this case came into being less than one year prior to the death of the insured by reason of the execution and delivery of the renewal certificate, which the company was neither obligated to execute, or deliver, or the insured to accept."

Counsel then refer to fire insurance policies and indemnity insurance bonds running for a limited period with provisions for renewal by agreement of the parties, and finds from the authorities cited that such renewal contracts are new and independent contracts commencing only at the date of renewal. Respondent's counsel meet this contention by the authorities they cite tending to establish a contrary doctrine.

The difficulty, however, is, as before suggested, none of the cases cited on either side are even persuasive as to the question presented here, however illuminating they might be in cases to which they apply. Here we are dealing with a statute which must be interpreted, if possible, so as to give force and effect to the manifest intention of the Legislature. We have already held, while discussing other questions presented, that accident insurance companies insuring against death by accidental means are, to that extent, life insurance companies, and are within the provisions of the statute the same as regular life insurance companies. As to the questions already disposed of, we are satisfied that our views as expressed rest upon a firm foundation. If the position now taken by appellant's counsel as to the immediate question under review is sound and ought to prevail, of course all that we have hitherto said goes for naught. These considerations alone impel the necessity of briefly considering the statute,

section 1171, in a new light and for another purpose. For convenience in this connection we again quote the statute:

"From and after the passage of this chapter, the suicide of a policy holder after the first policy year of any life insurance company doing business in this state shall not be a defense against the payment of a life insurance policy, whether said suicide was voluntary or involuntary and whether said policy holder was sane or insane."

It is suggested by appellant's counsel in the excerpt quoted from his brief, that if Carter had been insured in what is called a "life insurance company instead of an accident insurance company, there could be no question but that he did not die within the first policy year." But having been insured in an accident insurance company which insures only for a year, with provisions for renewal at the end of each year, it should be held that his death occurred within the first policy year, and therefore the instant case does not come within the provisions of the statute. It is apropos in this connection to quote a few lines from the opinion of Judge Tillman D. Johnson, United States District Judge for the District of Utah, in disposing of the motion for a new trial in the Agee Case, supra, in which the same contention was made by appellant. We quote the language as it appears in the brief of respondent's counsel:

"In other words, it is the contention of counsel that there never was a time when the language of the statute, 'after the first policy year,' would apply. The language 'the first policy year,' found in the statute should be given a broader meaning than that contended for by counsel. It seems to me to fairly apply where accident policies are continued from year to year by the payment and receipt of the stipulated premium."

It seems to the court that this is a correct interpretation of the Utah statute. Indeed it is not difficult to justify the interpretation from the literal terms of the statute itself, even if we accept appellant's theory of several annual policies instead of one running through all the years. According to appellant's contention, there were in this case eight policies, one for 1915, commencing March 30th of that year, and one for each year thereafter. It is the same policy in its

terms and form during every year, without the slightest variation. Indeed there was never in fact but one policy in form issued to the insured, and that was the policy of March 30, 1915, made part of the record in this case. Now the question is, What was "the first policy year" of the policy in question? I am impelled to the conclusion that "the first policy year" was from March 30, 1915, to March 30, 1916. There can be no dispute concerning the purpose of the Legislature in providing that suicide should be no defense after the first policy year. In addition to the purpose heretofore stated, its purpose, clearly, was to protect the insurance company against fraud on the part of the insured. The Legislature evidently assumed that after one whole year had elapsed from the time the insured made application for the policy it should be conclusively presumed that he did not contemplate suicide when he made the application, and consequently that he did not contemplate defrauding the company by taking his own life. In this class of cases, where the insured renews his policy every year for two or more years by payment of the annual premium in advance, which premium is accepted by the company, the case certainly comes within the plain purpose and intention of the Legislature. In the case of a regular life insurance company, if the insured does not pay the premium when due according to the terms of the policy, it lapses. In the kind of policy we have under review, if he does not renew it at the end of the year it also lapses. There may be some points of difference between the two classes of policies, which under other circumstances would require a marked differentiation as to the respective rights and obligations of the parties, but, as far as concerns the present question, the court is of opinion that the words "the first policy year," as used in the statute, where the policy has been annually renewed, means the year for which the policy was first issued.

This brings us to a consideration of the assignments of error:

The principal error relied on is the insufficiency of the evidence to sustain the verdict. The question is presented

under four assignments: (1) Refusal of the court to direct
a verdict for defendant; (2) refusal of the court to withdraw
from the jury the alleged accidental taking of an overdose
of laudanum; (3) refusal of the court to withdraw from the
jury the alleged accidental falling and striking his head upon
the floor as an accidental means of death, and (4) the court's
denial of defendant's motion for a new trial. These assign-
ments are all discussed under one head, and will be so con-
sidered by the court in its review of the evidence and con-
clusions drawn therefrom.

In harmony with what we have said in our interpretation
of the statute (section 1171), we shall review and consider
the evidence and determine therefrom whether or not plain-
tiff's evidence established a prima facie case of death by
accidental means, and shall disregard any evidence on the
part of defendant offered for the sole purpose of proving, or
tending to prove, that the insured deliberately took his own
life. Our theory is, as we have hereinbefore endeavored to
make plain, that suicide is a defense which is conclusively
barred by the statute. If, however, there is any evidence
other than that of suicide, tending to prove that the death
was not caused by accidental means, such evidence will re-
ceive due consideration.

The evidence on the part of the plaintiff, most of which is
uncontradicted, tends to prove that Carter was 5 feet and 10
inches in height, weighed from 195 to 200 pounds, and was
63 years of age at the time of his death. He had been en-
gaged for many years in the sheep and wool growing busi-
ness, and during that period of time lived at Vernal, Utah,
where he also had other business connections. He had a
family consisting of a wife and five children. From Vernal
he came to Salt Lake City, and afterwards became a wool
buyer, and together with a business associate represented a
Boston firm engaged in the same business. For many years
after moving to Salt Lake City he owned a home, where he
resided with his family. Later he sold his home, and to-
gether with his wife lived either with a daughter who was
married or in an apartment house in Salt Lake City. At

the time of his death and for some time previous he occupied
a suite consisting of two rooms, 141 and 142, in the Wilson
Hotel of said city, in one of which was a bed and bedroom
furniture, and in the other a bed, rocking chair, and tele-
phone which was attached to the wall near the outside door
of the room.  Some two or three years before his death he
sustained an injury to one of his ankles, either a break or a
fracture, which caused him at times to limp and walk with a
cane, but it does not appear that the injury rendered him a
cripple or amounted to more than a slight inconvenience.
Otherwise, as far as his general health was concerned, it ap-
pears to have been good for a man of his age.  He is described
generally as being of a jovial sunny nature, except during the
last few days of his life.  It appears also that he at times
had been afflicted with insomnia, and had been known on a
few occasions to take small doses of laudanum to enable him
to sleep.  On being seen by members of his family to take
laudanum, in answer to their inquiries, he told them he did
it to produce sleep, and for them not to worry as he knew
how much to take.  The evidence also tends to show that he
had purchased a certain bottle of laudanum some 18 or 20
years ago from the Heber Drug Company, in Heber, Utah,
and that he had retained the same bottle ever since.  It also
appears that Mrs. Odekirk, a married daughter, in whose
apartment he and his wife occasionally resided, sometimes
occupied one of his rooms at the Wilson Hotel.  She saw him
take laudanum out of the bottle referred to on two occasions,
the last time in his room at the hotel about a week before
his death.  Carter also had a summer home at Brighton,
Utah, to which he and his wife sometimes resorted during the
outing season.  His wife was at Brighton at the time of his
death.  During the last few days before his death he was
not as jovial as usual.  He was more quiet and less disposed
to indulge in conversation.

Mrs. Odekirk, the daughter, went to Brighton on Monday
the 11th of September, 1922, to meet her husband, leaving
Carter still occupying his rooms at the hotel.  On the morn-
ing of the 13th, two days after, at 8:30 a. m., the bellboy at

the Wilson Hotel received a call from Carter and an order
for ice water. The ice water was brought, at which time
Carter told him to call again about 11 o'clock; that he was
expecting a call from M. E. Wilson, his attorney. The bell-
boy went back at that time and knocked at the door three or
four times, but there was no response. At 11:30 a. m. of
the same day Carter's business associate, a Mr. Randall, who
had his office with Carter in the Ness Building, Salt Lake
City, in looking over his mail found two letters for Carter.
He called Carter over the phone and asked him if he should
read them over the phone or bring them over to the hotel.
Carter told him to bring them over. Randall said all right,
he would be over in five or ten minutes. Carter asked him
what time it was, and Randall looked at his watch and said
it was 11:30. Randall then picked up some things, put them
in his pocket, closed up his desk and went over to Carter's
rooms. He rapped on the door a couple of times but re-
ceived no response. Concluding Carter had gone to sleep,
Randall went home. In the conversation over the phone
Randall asked Carter how he felt, and Carter said: "I am
feeling fine." One of the hotel chambermaids went to
Carter's rooms to straighten them up. She thinks it was
about 11 o'clock. She found the door locked with the key in
the door on the inside. She went back about a quarter to
three in the afternoon. The door was still locked, but the
key had been taken out. She used her pass-key to unlock the
door. She could only open it partially, as his body was
lying against it. His shoulders were lying on the back of a
rocking chair that was turned face down. His head was
extending over, free from the chair. He was lying under the
telephone, which was by the side of the door. She then noti-
fied the housekeeper. The housekeeper in the main corro-
borated the maid as to the position of the body. At about 3
o'clock the hotel doctor came and also two or three officers
from the police department. The laudanum bottle was found
under the pillow of his bed in room 141. It contained about
one-half an ounce of laudanum. It was a two-ounce bottle.
In a spittoon there were indications of laudanum which had

been thrown up with stomach emission. The laudanum in the spittoon was recognized by its odor.

Carter's estate, after his death, was appraised at a sum exceeding $13,000, and his financial standing with his business associates was good. As far as appears in the evidence, he had no occasion to worry over financial affairs.

Dr. Pinkerton, the hotel physician and witness for plaintiff, was called and arrived at the hotel about 3 o'clock p. m., and viewed the body of Carter and testified: "His body was rigid. I found rigor mortis; that is the stiffening of the whole body. His whole body was stiff. In my judgment he had been dead about three hours." He testified also to seeing the bottle containing the laudanum, and it was about one-fourth full, and that the cuspidor in the room contained stomach emission accompanied by an odor of laudanum. The witness also observed cyanosis or blueness. The cyanosis was general.

In answer to a hypothetical question based upon the material facts as we have detailed them in the above statement, the witness said that in his opinion the death was caused by laudanum poisoning. In answer to another question as to whether the death could have been caused by a fall, the witness said: "Perhaps it could, taking out all other questions." He further stated, however, that it was more probable that it was caused by laudanum poisoning than by a fall. The witness described cyanosis as a symptom of respiratory failure, a symptom of death by asphyxia, which is the condition in laudanum poisoning. The blue spots on the body indicate asphyxia, which is the cause of death in laudanum poisoning. Early rigor mortis follows death by laudanum poisoning. That was one reason why witness concluded that death resulted from laudanum poisoning; for as a rule rigor mortis does not appear until about eight hours, but in this case, according to the history of the case, it was only about four hours.

Dr. Wm. F. Beer, a witness for plaintiff, was asked substantially the same hypothetical question that was propounded to Dr. Pinkerton, and answered to the effect that from the position of his body as stated and the fact that at

11:30 he had conversed intelligently over the phone, and at
11:45 did not respond to the knock on the door, and at 3
o'clock he was found dead and in a state of rigor mortis,
which is evidence he had been dead for some time, the witness
was of opinion the probable cause of death was a blow on
the head. His opinion was that it was more probable that
death was caused in that way than by laudanum poisoning,
because in laudanum poisoning rigor mortis is slower in
coming on and of shorter duration than in cases where death
is caused by violence. In such cases rigor mortis is very
rapid and of long duration. Ordinarily, when sufficient
laudanum to produce death is taken by such a person as is
described in the question, death would result anywhere from
6 to 24 hours. The witness also stated, in effect, that, not-
withstanding the laudanum, the vomitus in the cuspidor, and
the distinct odor of laudanum therefrom and the cyanosis
indications, the position of the body would cause him to form
an opinion that the death was due to a blow on the head. If
a man should fall down and knock a chair over, or if the
chair were on the floor and he fell on the back of the chair,
and when found later in a state of rigor mortis with the
chair under him, it is plainly evident that the minute the
man's head went down and struck that floor that life was
gone; he was totally unconscious; he was not capable of
moving his body, which is contrary to any condition of a
man who is under the influence of laudanum. If he should
fall down due to a sleepy condition that comes over him, he is
not going to lie there with a chair under his back, because he
is not unconscious, and he will move around to a comfortable
position before he quits. Cyanosis is found in other condi-
tions—in strangulation—anything that would interfere with
the inhalation of air.

Dr. Estees, a witness for plaintiff, was asked substantially
the same hypothetical question, and was of opinion death was
caused by a blow or external injury to the head or neck. He
would not expect that a person would die from laudanum
poisoning and his body be stiff and rigid in as short a time
as that indicated in the question. His answer that the death

was more probably caused by a blow rather than from laudanum poisoning was based upon the assumption that the phone conversation was at 11:30; that the man died a few minutes afterwards, and at 3 p. m. his body was rigid. This, together with the position of the furniture and the position of his body with reference to the furniture, was the basis of his opinion. This witness in the main corroborated the testimony of Dr. Beer.

Herman Harms, state chemist for Utah, also testified for plaintiff. He analyzed the contents of the bottle, and used about one-half the contents in his analysis. He found it to be a standard strength preparation of opium, containing practically 10 per cent. opium. There were several rings on the bottle caused by sediment settling. In his opinion the fluid contained in the bottle had probably been there for a number of years. It was the old style laudanum. A 2-ounce bottle is equal to 16 teaspoonsful. The recognized standard dose is about one-eighth of a teaspoonful. A teaspoonful of this laudanum would be considered a poisonous dose; two or three teaspoonsful would almost inevitably endanger life unless the person was an addict accustomed to the drug. The witness had known of addicts that could take an ounce without serious effects except the effect they desired. Any medicine, as laudanum, that is administered in drop doses should be administered by means of a medicine dropper. It would be practically impossible to administer it by dropping from the neck of a bottle. It takes an expert to do it. A teaspoonful would be a poisonous dose, but not necessarily fatal. In case of death by laudanum poisoning the time is ordinarily stated to be from 6 to 10 hours. Deaths have occurred in less than an hour, but those were exceptional cases. The average is from 6 to 10 hours. Assuming that a man had had no breakfast and takes a dose of laudanum at 10:30, of two teaspoonsful, and the man is 63 years of age, who was not an addict but took it occasionally, death would probably result in 4 or 5 hours. Morphine or opium is not a quick killing drug. Death by laudanum is a painless death. The state of laudanum poisoning may be divided into three; the

first a state of exhilaration; second a state of drowsiness; and the third of narcosis or unconsciousness. The first stage is in a majority of the cases, and might be described as a pleasing stimulant, where the person feels free from care. It is accompanied with more or less hallucination—great wealth, etc. This stage usually lasts 15 or 20 minutes, and is followed by a feeling of drowsiness, dizziness, langour, and a desire to lie down and rest. Then nausea sets in and vomiting almost invariably occurs. The patient has an irresistible desire to sleep or lie down and rest. Then comes the state of narcosis, slow breathing accompanied with deep snoring. The pulse becomes weaker, the breathing slower, the patient finally sinks into coma, resulting in death. In case of an exceptionally large dose, and the person is more or less emaciated, the first stage, that is, of exhilaration, will not take place, but the patient almost immediately falls into a state of narcosis from which he cannot be aroused, and which results in death. If a person was in good health and possessed of his senses he would recognize within 15 or 20 minutes or 30 at the latest that he had taken an overdose, due to the state of exhilaration. The patient in such case would ordinarily retain such possession of his faculties as would enable him to call for help during that first period.

The foregoing is the substance of the evidence offered on the part of the plaintiff. At this point plaintiff rested her case. Defendant called the maid and housekeeper, who testified that when they opened the door and discovered the body the telephone receiver was on the hook. It was not hanging down. Dr. John J. Galligan, a witness for defendant, testified that he was city physician and health commissioner for Salt Lake City; that he examined the body of Carter between 7 and 8 p. m., of the day of his death, at the undertaker's parlor of Evans & Early in Salt Lake City; that the body was in a condition approaching complete rigor mortis, but there was not a complete stiffening of the head, neck, and extremities; that he examined the head and neck for fractures and found none. He could not tell whether or not there was a clot of blood on the brain. Such could not be deter-

mined without an autopsy, which was not made. He did not remove the hair of the head. He also examined the chest and extremities for injuries and found none. He found no bruises, only a slight abrasion over one of his eyes. He came to the conclusion the death was not the result of a blow on the head or external violence. He was unable to ascertain the cause of death on his own examination. He corroborated the testimony of plaintiff's witnesses as to the different stages resulting from an overdose of laudanum. He also testified that rigor mortis is ordinarily complete from 6 to 12 hours after death. He thought the body had not been embalmed when he examined it, but was not sure. He did not remember who was with him when he made his examination. He thought one of the attendants was there.

The evidence of Dr. Galligan was somewhat weakened by his admission that he had told Mr. Rich, one of the respondent's attorneys, before the trial, in substance, that he did not see how he could be a witness for either side—that he did not see how he could do either side any good.

Omitting reference to evidence offered by defendant for the sole purpose of establishing intentional suicide, we have endeavored in the foregoing review to state the substance of all the evidence bearing upon the question of whether or not the death was caused by accidental means. There is practically no dispute as to the physical conditions above described. The most substantial conflict in the evidence is found in the testimony of the medical experts as to the cause of death.

The sole issue upon which the case was tried and presented to the jury was that of intentional suicide or death by accidental means. Counsel for appellant in his brief, at numerous places, states that to be the only issue. Respondent's counsel accept that as the only issue, so that the question of what may be called a natural death is not involved. Indeed the health of the insured and the circumstances attending his death logically exclude any hypothesis of a natural death. By this process of elimination the case is stripped of what might otherwise be a troublesome factor.

In order to justify a reversal of the judgment on the grounds of insufficiency of the evidence to sustain the verdict, it will be necessary for the court to find as matter of law that there is no substantial evidence in the case from which the jury could lawfully infer that the death was caused by accidental means.   As the case now **5, 6** stands before this court in the light of the issues above defined we are of opinion the correct rule for our guidance is well stated in the ninth headnote to *Brunswick* v. *Standard Acc. Ins. Co.,* 278 Mo. 154, 213 S. W. 45, 7 A. L. R. 1213. The opinion itself, of which the headnote is a reflection, cites numerous cases at pages 49 and 50 strongly supporting the opinion.   The headnote reads:

"In an action on an accident policy, where it is shown the death must have been accidental or suicidal, the presumption against suicide as cause of assured's death can be overcome by circumstantial evidence, only if it is of such quality and weight as to negative every reasonable inference of death by accident."

We will now briefly consider the facts and circumstances of the case.   We need not here repeat what was shown concerning Carter's past life, his family relations, his business career, and temporary home at the Wilson Hotel, nor his occasional use of laudanum for insomnia, but come directly to what occurred on the very day of his death   The last person who saw him alive was the bellboy, who brought him ice water at 8:30 a. m.   He asked Carter if he wanted anything to eat; Carter said no, but told him to come back at 11 o'clock.

There is an apparent conflict in the testimony as to the exact time when certain events took place.   Randall's testimony is clear to the effect that he had his conversation with Carter a few minutes after 11:30.   The hotel operator said there was only one outside call for Carter that morning, and that was about 10:30.   She had some difficulty in getting a response to her call, and had to wait.   The bellboy testified he returned to the room about 11 o'clock and knocked at the door, but received no response.   The chambermaid testified she went to the rooms about 11 o'clock to straighten them

up, knocked on the door, and received no response. She examined the door and found the key was in the lock on the inside. When she returned to the room at 3 p. m. the key had been taken out of the lock. She opened the door with her pass-key and found the body. The key in the lock inside at 11 a. m. and out of the lock at 3 p. m. are circumstances from which the apparent conflict . is easily reconcilable. When the maid and bellboy each knocked and there was no response Carter was neither dead nor unconscious from' laudanum, for he afterwards conversed with Randall over the phone. Besides, no one but Carter could have afterwards removed the key from the lock. These circumstances strongly corroborate the testimony of Randall that his phone conversation with Carter was some minutes after 11:30 o'clock. Besides, he was the only one of the witnesses who looked at his watch to ascertain the time. The only significance in the circumstances above noted is to make it clear that Carter's death could not possibly have occurred until some time after 11:30 o'clock.

There is in the Randall conversation, and the circumstances attending it, something apparently inconsistent with any theory of intentional suicide whether we assume Carter took the dose either before or after Randall called him up. If Carter had taken the dose before and was in the stage of exhilaration described by the experts, and that accounted for his feeling fine, which is assumed as one of the hypotheses upon which appellant relies, why would he want Randall to come right over and bring the letters? If at that time he had taken an overdose of laudanum with the deliberate intention of taking his own life why should he tell his business associate, perhaps his best friend, to bring the letters over to his room? Is it probable that under such circumstances he would want Randall or any other person to come to his rooms, least of all Randall, who would most certainly at once employ effectual means to frustrate his design of deliberate suicide? If we assume that Carter did not take the poison until after his phone conversation with Randall, then the theory of deliberate suicide becomes all the more unten-

able, for at that time he had every reason to believe that
Randall would appear at any moment of time. I was some-
what impressed with appellant's theory that Carter took the
laudanum before Randall called him, and that that accounted
for his feeling fine, but it is exceedingly difficult under these
circumstances for me to conceive that he took the laudanum
with the deliberate intention of taking his own life. If we
add to this the further fact that Carter's body and the rock-
ing chair were found with reference to each other in a posi-
tion about as awkward as the human mind can conceive of,
the question we have to determine becomes all the more
complex and confusing. No one has had the temerity to
contend that he intentionally took a lethal dose of poison,
turned the rocking chair over face down, and then lay down
on his back with his shoulders across the chair with his head
hanging free from the chair or on the floor as testified to by
one of the witnesses. That there was some kind of a fortu-
itous incident or accident in that room of which Carter. was
a victim, whether it caused his death or not, is one of the
clearest inferences in the case. The awkward position of the
body which I have just described, together with the opinion
that too short a time had elapsed to justify the assumption
that he died from an overdose of laudanum followed by com-
plete rigor mortis, is one of the principal reasons why Drs.
Beers and Estees concluded he must have died from the
fall. They further justified their opinions from the fact that
if he had not become immediately unconscious by the fall he
would not have retained that awkward, uncomfortable atti-
tude on the chair, but would have shifted his body into a
more comfortable position. Can this court say as matter of
law that such an inference is overdrawn or too speculative to
be considered as evidence in the case? But it is contended
that the testimony of Dr. Galligan rebuts these inferences
and assumptions, because he examined the body for frac-
tures and injuries and found none. Dr. Galligan admitted
there was no autopsy, and without an autopsy it could not be
determined whether or not there was a clot on the brain. He
did not remove the hair of the head. He simply felt for frac-

tures through the hair, and felt his neck, which he said was approaching complete rigor mortis, then examined the chest and extremities, and concluded his death was not the result of an accident. Besides this, the admission as to what he said to Mr. Rich before the trial may have had some effect upon the minds of the jury, going to the question of his credibility.

Adverting again to the question of intentional suicide or accidental death by means of an overdose of laudanum, counsel for appellant in our opinion, lay too much stress on the fact that Carter had told his wife and daughter that he knew just how much laudanum to take, and for them not to worry. Reasoning from this point of view counsel contend that Carter knew just how much laudanum to take, and therefore what he took must have been the exact quantity intended. In other words, he deliberately intended to take a fatal dose.

The reasoning of counsel is not altogether justified by the experience of mankind. The thought has often been expressed that the best swimmers are most likely to drown because they become reckless and venture too far from shore. The evidence shows that on the few occasions when Carter was seen to take laudanum he poured it or dropped it from the neck of a bottle. He did not use a medicine dropper which, according to the testimony of State Chemist Harms is the only safe way to use it. Harms testified, in effect, that it required an expert to administer laudanum by dropping it from a bottle. This being true, it follows that, if a person is not exceedingly careful he may easily take many drops more than was intended, by taking it as Carter had been seen to take it. No one can tell from the testimony how much laudanum Carter took. Dr. Pinkerton testified when he saw the bottle at the time it was discovered it was about one-fourth full. Chemist Harms says he used half of that in his analysis. It was a 2-ounce bottle. The remainder of the laudanum, or one-eighth of an ounce, was exhibited at the trial. Mrs. Odekirk, Carter's daughter, testified that when Carter took the last dose she saw him take, about a week before his death, she looked at the bottle and thought it

contained about three times as much as was produced at the trial. Assuming these estimates in every instance to be reasonably accurate, we arrive at the conclusion that at the time when she saw him take the last dose there was three-eighths of an ounce in the bottle. But the difficulty in arriving at a correct estimate of what there was in the bottle when he took the dose which appellant contends resulted in his death rests in the fact that, for aught any one knows, he may have taken many doses during the last week of his life. Is there any presumption that the last dose Mrs. Odekirk saw him take was the last dose he took before taking the alleged fatal dose? Must it be assumed that every time he took laudanum he did it in the presence of some member of his family? The question itself suggests the answer. Randall testified that in the phone conversation he asked Carter how he was feeling and Carter said, "fine." Randall further testified that the reason he asked Carter that was because when he last saw him, on the Monday previous, Carter was not feeling well. In these circumstances, assuming that a moderate safe dose of laudanum has a soothing tendency, it cannot be conclusively presumed that Carter did not take several doses out of the bottle during the last week of his life and prior to the date of his death. It may therefore be assumed from reasonable inferences, based on circumstances established by the evidence, that the exact quantity of laudanum that was in the bottle just prior to Carter's taking the alleged fatal dose is a matter of pure guesswork and speculation.

There is another circumstance from which an inference may be drawn against the theory of intentional suicide. The bottle of laudanum was found under the pillow of his bed. Would a person who had deliberately taken a dose of laudanum to end his life go to the trouble of placing the bottle under the pillow of his bed? And especially if one of his purposes was to defraud the insurance company which had insured his life by a policy excluding suicide as a ground of recovery? Would he not adopt some other method of disposing of the means which effected his death than by placing the

best possible evidence of it under the pillow of his bed? The record is replete with evidence to the effect that after taking a lethal dose of laudanum many minutes may elapse before instant case there is no consistency whatever between the the patient becomes helpless or unconscious. So that in the theory of intentional suicide on the part of Carter and many features of his conduct at or near the time of his death.

But counsel for appellant make the further point that after taking the laudanum he had ample time to call for help. This might be true assuming that he did not die from the fall. But suppose, even, that he died from laudanum poisoning, who can tell whether or not he tried to call for help? The fact that he did not do so is not conclusive. Who knows that he did not make the effort? His bed, where he had been lying, was in one room, and the bottle of laudanum was under the pillow; the telephone by the side of a door leading into the hall was in the other room. The only way to call for help or obtain help was probably through the telephone or by opening the door. His body was found under the telephone and about as close to the door as possible. We do not care to speculate or theorize as to the meaning of these circumstances except to reiterate the thought that the fact that he did not call for help is not conclusive in favor of appellant's contention.

The opinions of Drs. Beer and Estees were that he died from the fall. It was the opinion of Dr. Pinkerton that his death was caused by laudanum poisoning. All of these facts, circumstances, and opinions were laid before the jury for them to make such deductions and draw such inferences as the evidence warranted. Not only this, but the defendant was permitted to introduce in its defense evidence, which, for reasons stated, we have not considered, tending to prove that Carter had a motive for taking his own life, and the instructions of the court permitted the jury to consider such evidence. Notwithstanding all, the jury by its verdict found that his death was caused by accidental means, and we are of opinion that the evidence sus-

tains the verdict, especially when we apply the rule heretofore announced that:

"In an action on an accident policy, where it is shown the death must have been accidental or suicidal, the presumption against suicide as cause of assured's death can be overcome by circumstantial evidence only if it is of such quality and weight as to negative every reasonable inference of death by accident."

We are of opinion this rule is elementary, especially when applied after verdict for the purpose of determining whether or not the evidence was sufficient.

But counsel for appellant make the contention that there is a difference between an accidental death and a death by "accidental means," and that it was death by "accidental means" that Carter was insured against. The distinction appears to be somewhat refined, but counsel refer us to many cases which it is claimed support their contention. *Barry* v. *Association* (C. C.) 23 F. 712, 131 U. S. 100, 9 S. Ct. 755, 33 L. Ed. 60; Joyce, Insurance, 2863; *Accident Ins. Co.* v. *Carson* (Ky.) 30 S. W. 879; *Hess* v. *Association,* 112 Mich. 196, 70 N. W. 460, 40 L. R. A. 444; *Badenfield* v. *Association,* 154 Mass. 77, 27 N. E. 769, 13 L. R. A. 263; *Association* v. *Wiswell,* 56 Kan. 765, 44 P. 996; *Carnes* v. *Iowa Traveling Men's Ass'n,* 106 Iowa, 281, 76 N. W. 683, 68 Am. St. Rep. 306; *In re Scarr* (Eng.) 2 B. R. C. 358; *Clidero* v. *Scottish Acc. Ins. Co.,* 19 R. 355, 29 Sc. L. R. 303; *Shanberg* v. *Fidelity, etc., Co.,* 19 L. R. A. (N. S.) 1206; *Hastings* v. *Travelers' Ins. Co.* (C. C.) 190 F. 258; *Southard* v. *Railway Pass. Assur. Co.,* 34 Conn. 574, Fed. Cas. No. 13182; *Cobb* v. *Mutual Acc. Association,* 96 Ga. 818, 22 S. E. 976; *Scmid* v. *Indiana Travelers' Acc. Ass'n,* 42 Ind. App. 483, 85 N. E. 1032; *Smouse* v. *Iowa State Traveling Men's Ass'n,* 118 Iowa, 436, 92 N. W. 53; *McGlinchey* v. *Fidelity, etc., Co.,* 80 Me. 251, 14 A. 13, 6 Am. St. Rep. 190; *Johns* v. *Northwestern Mut. Relief Ass'n,* 90 Wis. 332, 63 N. W. 276, 41 L. R. A. 587; *Rock* v. *Travelers' Ins. Co.,* 172 Cal. 462, 156 P. 1029, L. R. A. 1916E, 1196; *Feder* v. *Iowa State Traveling Men's Ass'n,* 107 Iowa, 538, 78 N. W. 252, 43 L. R. A. 693, 70 Am. St Rep. 212.

The cases above cited all go to the point that if a person does exactly what he intended to do and death occurs with-

out intending it, it is an accidental death, but not a death by accidental means. We regret our inability to review these cases within reasonable limits. We will, however, quote a few excerpts to illustrate the rule which counsel contends should be applied in the instant case. In *Barry* v. *Association,* supra, the court says:

> "The term accidental is here used in its ordinary, popular sense, and in that sense it means 'happening by chance, unexpectedly; taking place not according to the usual course of things,' or not as expected. In other words, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, then, I suppose, it cannot be called a result effected by accidental means. But if in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted from the accident, or through accidental means."

In 3 Joyce, supra, the author, quoting from the Clidero Case, supra, states the rule as follows:

> "A person may do a certain act, the result of which act may produce unforeseen consequences, and may produce what is commonly called accidental death, but the means are exactly what the man intended to use and did use, and was prepared to use. The means were not accidental, but the result might be accidental."

We quote the following from *Carnes* v. *Iowa Traveling Men's Ass'n,* supra:

> "It is said, however, that death will be presumed to have resulted from accident, and that the burden of proof is upon the defendant to show the contrary. But an examination of the cases does not sustain this contention. They go no further than to hold that, where the insured has introduced evidence tending to show an injury to be the result of an accident, the burden of proof is on the insurer to establish as a defense that the insured was within some exceptions of the policy."

The above quotations fairly typify the doctrine upon which appellant relies. Most of the cases cited were cases in which the exact cause of death was known, and it was clear that no fortuitous incident occurred which caused the death. Death, of course, was not intended, but the act which caused the death was intended, and that is the distinction upon which the cases rest.

The same contention was made and the same rule invoked in *Richards* v. *Standard Acc. Ins. Co.*, 58 Utah, 622, 200 P. 1017, 17 A. L. R. 1183. Richards was insured against death by a policy similar to the one in question here. He came to his death by a sunstroke on an Arizona desert. His beneficiary brought an action to recover the principal sum, alleging death by accidental means. Defendant answered and among other things alleged:

" * * * The said Richards, of his own volition, and with knowledge of the climate and heat, and knowing that he had to pass over a desert country without water or shade on the road, and under a burning summer sun, undertook to walk to the mining prospect, a distance of about 16 miles, in his usual and ordinary way, and that in all the premises Richards did what he intended to do and not otherwise, and that his death was the natural result of his own acts."

It will be observed that the defendant in that case in its answer attempted to bring the case within the very same rule that is now being contended for in the case at bar. On page 632 of the report (58 Utah [200 P. 1021]), the court, referring to appellant's contention, uses the following language:

"Appellant's counsel further argues that the policy does not insure against accidental death, and that unless the injury or death was caused by accidental means the company is not liable. This argument is fortified by many authorities clearly distinguishing between accidental death and death by accidental means. The policy upon which this suit is predicated does not insure against accidental death. Its language is that the insurance is against loss from bodily injuries effected through accidental means. Now, what is meant by 'accidental means?' Is sunstroke, like lightning, itself an accidental means or cause? The question is answered in the negative by all courts that treat sunstroke as a disease when the word 'sunstroke' is used in or in connection with an accident insurance policy, but the trend of judicial opinion is not now in accord with the doctrine of such cases."

It is clear that the same contention and same argument were made in that case as now appears in the brief of appellant in the instant case. The rule contended for was rejected in that case, and a careful reading of the opinion will disclose the fact that the reason for its rejection was because the

court was of opinion that a more liberal construction should be given to the terms of the policy.

The whole tenor of the opinion in the Richards Case is against the narrow interpretation which appellant then sought, and now seeks, to place upon the terms of the policy. The concurring opinion of Mr. Justice Frick in that case is also apropos in this connection. We quote the same at length, because the thought expressed is equally applicable here in view of the technical distinction urged by appellant:

"I concur both in the reasoning and in the conclusions of Mr. Justice Weber. I have less hesitation in doing so for the reason that sunstroke, as commonly understood by the layman, is not a disease. The defendant was as well aware of that fact as any one. If, therefore, it was intended that sunstroke should be excluded as one of the hazards covered by the policy, the defendant should have said so in the policy itself. Not having done that, and having thus led the ordinary layman to assume that the term sunstroke was to receive its popular rather than its technical meaning, and having had the advantage of selling its policies to those who so understood the term, it should not now be permitted to insist upon the technical and restricted meaning of the term, at least not in a case like the one at bar. While if in a few words it had been stated in the policy that sunstroke was to be considered as a disease and not as an accident no one could have been misled, yet it might well be that if the exception had been thus plainly stated in the policy many of those who bought the policy in the belief that it covered sunstroke might have declined to enter into such a contract of insurance. The defendant having thus had the advantage of the popular understanding in selling insurance, it should in my judgment, also bear the consequences of that understanding."

So, in the instant case, it may be said: If an insured, at the time he applies for accident insurance, was made to understand that his right to recover would hinge upon such fine distinctions as the difference between "an accidental death" and a death by "accidental means" he would probably conclude that the purchase of such a policy would be a hazardous investment, and one which he ought not to make.

In nearly all of the cases cited by appellant upon this point, death resulted unexpectedly due to some overexertion causing strain upon the heart, rupture of a blood vessel, or something of that nature while in pursuit of such business

as may occur in ordinary everyday life.  No man can tell
beforehand when an emergency may arise calling for an
extra exertion of his physical powers even in his usual and
ordinary business.  To say that if unexpected and uninten-
tional death occurs under such circumstances, due to such
overexertion under the circumstances then existing, such
death is not within the terms of the policy, is to apply the
rule of strictissimi juris in favor of the company, which is
contrary to the overwhelming weight of judicial opinion.
Such an interpretation of the terms of the policy is
evidently not what the insured understood or contem-        8
plated when he purchased the policy.  In any event,
such interpretation is not in harmony with the views of
this court as expressed in the Richards Case, but is in con-
flict with the rule therein announced, which rule is amply
supported by the authorities cited in the opinion.  See, also,
the following cases cited by respondent, many of which are in
point upon the question under review.  Those not in point
upon the immediate question are pertinent in reply to other
contentions made by appellant.  While it would make this
opinion more illuminating and instructive to review and
quote from many of the cases cited, we must refrain from
doing so because it would further extend our opinion, which
has already attained an unusual length.  *Husbands* v. *Indi-
ana Travelers' Ass'n* (Ind. App.) 130 N. E. 874; *Armstrong*
v. *Insurance Co.,* 41 Utah, 112, 124 P. 518; *United States* v.
*Barry,* 131 U. S. 100, 9 S. Ct. 755, 33 L. Ed. 60; *Grosvenor*
v. *Fidelity, etc., Co.,* 102 Neb. 629, 168 N. W. 596; *Townsend*
v. *Commercial Travelers' Ass'n,* 231 N. Y. 148, 131 N. E. 871,
17 A. L. R. 1001; *Wilkinson* v. *Standard Acc. Ins. Co.,* 180
Cal. 252, 180 P. 607; *Jenkin* v. *Pacific Mut. Life Ins. Co.,* 131
Cal. 121, 63 P. 180; *Mah See* v. *North American Acc. Ins.
Co.,* 131 Cal. 121, 213 P. 42; *Buckley* v. *Mass. Bond & Ins.
Co.,* 113 Wash. 13, 192 P. 924; *Starr* v. *Ætna Life Ins. Co.,*
41 Wash. 199, 83 P. 113, 4 L. R. A. (N. S.) 636; *Standard
Life & Acc. Co.* v. *Thornton,* 100 F. 582, 40 C. C. A. 564, 49
L. R. A. 116; *Ætna Life Ins. Co.* v. *Taylor,* 128 Ark. 155, 193
S. W. 540, Ann. Cas. 1918B, 1122; *Business Men's Acc. Co.*

v. *Cowden*, 131 Ark. 419, 199 S. W. 108; *Watkins* v. *Reliance Life Ins. Co.*, 152 Ark. 12, 238 S. W. 10; *Reynolds* v. *Maryland Cas. Co.*, 274 Mo. 83, 201 S. W. 1128; *Andrus* v. *Business Men's Acc. Ass'n*, 283 Mo. 442, 223 S. W. 70, 13 A. L. R. 779; *Wilkinson* v. *Ætna Life Ins. Co.*, 144 Ill. App. 38; *Kahn* v. *Metropolitan Cas. Co.* (Mo. Sup.) 240 S. W. 793; *Miner* v. *New Amsterdam Cas. Co.*, 220 Ill. App. 74; *Hodgson* v. *Preferred Acc. Ins. Co.*, 100 Misc. Rep. 155, 165 N. Y. S. 293; *Fehrer* v. *Millard Cas. Co.*, 179 Wis. 431, 190 N. W. 910; *Bohaker* v. *Travelers' Ins. Co.*, 215 Mass. 32, 102 N. E. 342, 46 L. R. A. (N. S.) 543; *Caldwell* v. *Iowa State Traveling Men's Ass'n*, 156 Iowa, 327, 136 N. W. 678.

Appellant's assignments of error as to the insufficiency of the evidence are not sustained.

Appellant also assigns as error the ruling of the court overruling defendant's objections to the hypothetical question propounded to Dr. Beers and Dr. Estees. One objection is that plaintiff alleged in her complaint that Carter's death was caused by taking an overdose of laudanum, and therefore it was error to ask the witnesses for their opinion as to the cause of his death.

This, it appears to us, is a distorted conception of the effect of the allegation referred to. Plaintiff alleged in her complaint that the "exact cause of his death was unknown, except that it occurred in either one or the other or both of the following causes and circumstances." She then sets out the causes separately, one of which was that he "accidentally took an overdose of laudanum not intending thereby to commit suicide or inflict injuries upon himself." To construe this as a positive admission that he took an overdose of laudanum—an admission by which plaintiff should be conclusively bound—would be to misinterpret the evident purpose and meaning of the allegation. The principal objection, however, is that the hypothetical question did not include all the matters upon which evidence had been given, and especially did not state that Carter had taken an overdose of laudanum. No witness testified directly that Carter had taken an overdose of laudanum. This, how-

ever, could be inferred from the circumstances, all of which were stated in the hypothetical question. The question covers three full pages of the printed abstract, **10, 11** and includes every material fact and circumstance concerning which any witness had testified prior to the time when the question was asked. In addition to this, appellant's counsel had and exercised the widest possible latitude on cross-examination in respect to the cause of death as the same appeared from the facts and circumstances disclosed by the evidence up to that time. In these circumstances, even if there had been error in permitting the question, which there was not, the error would be harmless. The exception here relied on is within the rule announced in *Johanson* v. *Huntsman,* 60 Utah, 402, 209 P. 197, which is the last expression of this court upon the question. There was no error in the ruling of the court.

Many other errors are assigned relating to instructions to the jury, refusals to instruct as requested, and rejection of evidence offered by defendant. Practically all of these assignments relate to or are connected with defendant's defense of intentional suicide, and as heretofore suggested were wholly immaterial as a defense to the action. There was no error in excluding such matters, and to the extent that the trial court permitted them to be considered, the defendant had an advantage to which it was not entitled under our interpretation of the statute.

Many of the questions presented for our decision have been exceedingly close, and for that reason we have endeavored to give them as careful consideration as circumstances would permit. The printed abstract of appellant is a model of what an abstract ought to be, and has greatly lessened the burden which the court would otherwise have had to bear. The briefs, also, of the parties on both sides of the case have been all that the court had the right to expect. We appreciate the importance of the case, and, notwithstanding the many angles we have had to consider, we have endeavored to dispose of every material question which in our opinion had any merit.

For the reasons stated the judgment of the trial court is affirmed at appellant's costs.

GIDEON, C. J., FRICK, J., and MATHISON, District Judge, concur.

STRAUP, J., being disqualified did not participate herein.

CHERRY, J. I concur in the judgment. The issue framed by the pleadings and upon which the action was tried and submitted to the jury was whether insured died from accidental causes or intentionally committed suicide. It was assumed at the trial that intentional suicide was a complete defense, and the jury was so instructed. The verdict was for the plaintiff. From the evidence it was permissible for the jury to conclude that the death was accidental and not suicidal, and the verdict is therefore supported by the evidence. The verdict plainly eliminates suicide, as a fact, from the case. The meaning or effect of the suicide statute relating to life insurance (Comp. Laws Utah, 1917, § 1171) seems, therefore, not a necessary question for consideration, because in no event can it affect the decision of the case at bar. Besides thinking the statute an unnecessary subject for consideration, I am unable to agree with the interpretation of its meaning and effect, as contained in the prevailing opinion. Comp. Laws Utah 1917, § 1144, as amended by chapter 29, Laws of Utah 1921, provides:

"All insurance business in the state of Utah, is hereby classified in the following eight kinds, namely: ·

"1. Life insurance, including within its meaning insurance upon the lives of persons and every insurance appertaining thereto, and the granting, purchasing and disposing of annuities.

"2. Fire insurance, including within its meaning ` * * . *

"3. Marine insurance, including within its meaning * * *

"4. Fidelity and surety insurance, including within its meaning * * *

"5. Liability insurance, including within its meaning * * *

"6. Accident insurance, and either sickness or health insurance, including within its meaning insurance against injury, disablement

or death resulting from traveling or general accidents, and against disablements resulting from sickness and every insurance appertaining thereto.

"7.   Automobile insurance, including within its meaning   *   *   *

"8.   Miscellaneous insurance, including within its meaning * * *"

The statute in question provides:

Section 1171.   "* * *   The suicide of a policy holder after the first policy year of any life insurance company doing business in this state shall not be a defense against the payment of a life insurance policy, whether said suicide was voluntary or involuntary and whether said policy holder was sane or insane."

The application of this statute to life insurance companies and life insurance policies, as those terms are commonly used and understood, is appropriate, and leads to results consistent with the manifest intention of the Legislature; but its application to accident insurance produces a situation so discordant and incongruous as to warrant the conclusion that the statute was never intended to apply to this form of insurance at all.

The ordinary accident insurance policy is a special limited contract, insuring against injury or loss of life by accidental means only.   To entitle the payee of the policy to recover upon it, according to first principles, he should affirmatively show a loss resulting from accidental means.   And in case of dispute the insurer's right to deny or disprove the alleged liability, upon plain principles, must necessarily follow.   Intentional suicide by a sane person is not an accident.   It ought not, therefore, be the basis for recovery upon a policy insuring against loss by accident.   The practical application of section 1171 to accident insurance upsets this whole formula.   If the insurer cannot show suicide for the purpose of disproving accident, the practical result is that suicide is made a ground of liability.   There is no consistent middle ground.   The statute does not prescribe a rule of evidence. The true meaning of the statute is that suicide, if made evident, would not affect the right of the parties, and proof of suicide is excluded solely because it is immaterial.   The proposition that proof of death by external and violent means,

aided by the presumption against suicide, makes a prima facie case of accidental death, which in practice becomes conclusive because the statute precludes proof which would overthrow the presumption and thus defeat the case, is but a sophistical evasion. The application of the statute to accident insurance leaves no escape from the anomalous conclusion that intentional suicide of the insured while sane becomes in fact a ground of recovery upon the policy. In other words, a loss from a cause clearly not accidental is permitted to be recovered upon a contract insuring against accidental losses only. This is a violent distortion of the contract not easily presumed to have been intended, and certainly not to be produced by doubtful or avoidable interpretation.

Section 1144, supra, separately defines and distinguishes between life insurance and "accident insurance." It cannot be denied that in the insurance business and in common usage the terms "life insurance" and "accident insurance" have significations separate and distinct, one from the other. In common parlance the term, "life insurance," does not include "accident insurance." It is not to be supposed that the framers of the statute in question used the term "life insurance" in a sense different from that understood and employed by men generally. While section 1144, supra, was enacted after section 1171, it is important as a legislative declaration of the distinction between life insurance and accident insurance. These reasons impel me to conclude that the statute is limited in its application to life insurance, as that term is popularly understood and distinguished by statute, and that it does not apply to accident insurance. This interpretation does not violate any approved rule of statutory construction. It preserves the main purpose and object of the statute, and avoids the absurd and incongruous consequences necessarily resulting from the application of the statute to accident insurance.

The cases of *Logan* v. *Fidelity & Casualty Co.*, 146 Mo. 114, 47 S. W. 948, and *Whitfield* v. *Ætna Life Ins. Co.*, 205 U. S. 489, 27 S. Ct. 578, 51 L. Ed. 895, are the main cases cited in support of the prevailing opinion. These cases deal

with the construction and application of a Missouri statute very similar to the statute of this state concerning suicide as a defense to the payment ór recovery of life insurance. These cases have been expressly distinguished and disapproved by later cases in Missouri, and an entirely different and opposing conclusion reached concerning the meaning and application of the statute. *Brunswick* v. *Standard A. I. Co.,* 278 Mo. 154, 213 S. W. 45, 7 A. L. R. 1213, distinguishes the Logan Case, and declines to follow the Whitfield Case, and declares that where the proof shows suicide by assured while sane the recovery is defeated for failure to establish death by accident. *Scales* v. *National Life & Acc. Ins. Co.* (Mo. Sup.) 212 S. W. 8, disposes of the Logan and Whitfield Cases as authority for the contrary, and holds the insurer not liable under a policy insuring against death by accident in case of death of insured by suicide while sane. *Andrus* v. *Business Men's Ass'n,* 283 Mo. 442, 223 S. W. 70, 13 A. L. R. 779, is plainly to the effect that suicide of insured while sane may be proved to show death was not accidental and thereby defeat recovery. To the same general effect is *Aufrichtig* v. *Colorado National Life Ins. Co.,* 298 Mo. 1, 249 S. W. 912. In *Landau* v. *Pacific Mutual Life Ins. Co.* (Mo. Sup.) 267 S. W. 370, a suit upon an accident indemnity policy, the verdict and judgment for plaintiff is reversed because the evidence strongly tended to show that insured's death was suicidal. In this case the court says:

"The defendant could have offered proof that the death was the result of suicide, or resulted from disease or natural causes, under a general denial. Under the general issue, the defendant can offer any evidence that tends to prove that plaintiff's alleged cause of action never existed. The rule is elementary."

The authoritative interpretation of the Missouri statute is thus directly in conflict with the views expressed in the prevailing opinion respecting the Utah statute.